UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| _____ : | | |
| Samuel Randolph, : | | |
| : | | |
| Plaintiff, : | | Civil Action Number |
| : | | _____ |
| v. : | | |
| : | | JURY TRIAL DEMANDED |
| City of Harrisburg, Sergeant Robert : | | |
| Fegan, and Investigators : | | |
| Donald Heffner; David : | | |
| Lau, Timothy Carter, and Kevin : | | |
| Duffin, in their individual capacities : | | |
| : | | |
| : | | |
| Defendants. : | | |
| _____ : | | |

## COMPLAINT

### Introduction

Plaintiff Samuel Randolph was wrongfully convicted of murder and spent 20 years under sentence of death.[1]  Mr. Randolph is innocent, and spent half his life on death row because of the actions of Harrisburg Police Department ("HPD") Investigators Carter, Lau, Heffner and Duffin, while supervised by Defendant Fegan, who, it is alleged, conspired to and did manipulate and coerce numerous witnesses

---

[1] The last 13 years were spent confined to a bed, as Mr. Randolph has been unable to walk after being assaulted by Correctional Officers in 2013.

into falsely implicating and testifying against Mr. Randolph via threats and promises and subsequently failed to disclose this unlawful conduct.

Those egregious and costly violations of Mr. Randolph's constitutional rights were not simply a product of a few bad officers gone rogue.  They were the result of the City of Harrisburg's longstanding policy, practice, or custom of employing appalling constitutional violations in the investigation and prosecution of homicide and attempted homicide cases, a tool that HPD has used for decades to secure many wrongful arrests and convictions.

Mr. Randolph brings this suit to obtain a measure of justice from the City of Harrisburg and Defendants Lau, Duffin, Heffner, Carter, and Fegan for the irreversible wrongs they perpetrated on him.

## Jurisdiction and Venue

1.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

2.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (civil rights).

3.      The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Mr. Randolph's Pennsylvania pendent state law claims.

4.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred here.

## Parties

5.      Plaintiff Samuel Randolph is and was at all times relevant to this Complaint a resident of Pennsylvania.

6.      Defendant City of Harrisburg is a municipality in the Commonwealth of Pennsylvania.  It owns, operates, manages, directs, and controls the HPD, which, at all times relevant to this complaint, employed Defendants Fegan, Lau, Heffner, Carter and Duffin.

7.      Defendant Robert Fegan was at all relevant times employed as a Sergeant with the HPD.  He is sued in his individual capacity.

8.      Defendant David Lau was at all relevant times employed as an Investigator with the HPD.  He is sued in his individual capacity.

9.      Defendant Donald Heffner was at all relevant times employed as an Investigator with the HPD.  He is sued in his individual capacity.

10.      Defendant Timothy Carter was at all relevant times employed as an Investigator with the HPD.  He is sued in his individual capacity.

11.      Defendant Kevin Duffin was at all relevant times employed as an Investigator with the HPD.  He is sued in his individual capacity.

### Statement of Facts

12.     On May 14, 2003, Samuel Randolph was convicted in the Dauphin County Court of Common Pleas of two counts of first-degree murder, conspiracy to commit murder, two counts of criminal attempt, three counts of aggravated assault, two counts of firearms violations, and reckless endangerment.

13.     The charges that Mr. Randolph faced, which were joined in a single jury trial, stemmed from three separate shooting incidents in Harrisburg, Pennsylvania in September of 2001.

14.     Initially, there was no evidence tying Mr. Randolph to any of these shootings.  HPD investigators, including the lead investigator Defendant Timothy Carter, had some suspicion of Mr. Randolph's involvement because he had been in a fight with some of the victims a few days prior.  However, HPD knew that other suspects, like Quendell Oliver and his associates, had far better motive, opportunity, and means to have committed the crimes.

15.     However, when the investigation into those suspects hit a dead end, HPD investigators, including Defendants Carter, David Lau, Donald Heffner, and Kevin Duffin, went back to witnesses who had previously failed to identify anyone and enticed them to falsely identify Samuel Randolph, through the apparent use of the threat of criminal charges, harsh treatment in pending cases, or leniency in pending cases as compulsion.  These HPD investigators failed to disclose to

prosecutors or defense counsel their unconstitutional behavior as required under *Brady v. Maryland*,[2] and Mr. Randolph was ultimately convicted of all three incidents and sentenced to death.

16.    The first shooting incident was a September 2, 2001 drive-by shooting at a bar called the Baby Grand, owned by Ronal Roebuck, where Gary Waters was wounded.   In that incident, it is believed and therefore averred that HPD Investigators – including Carter, Duffin, Heffner, and Lau – successfully enticed witness Ronald Roebuck to falsely identify Mr. Randolph as the shooter, despite knowing that Ronald Roebuck could not have seen the incident from inside the bar, and attempted to coerce other witnesses to testify to the same (albeit unsuccessfully).

17.    The second incident was another drive-by shooting in the vicinity of 6th Avenue and Maclay Street on September 3, 2001.  It is believed and therefore averred that HPD Investigators including Carter, Duffin, Heffner, and Lau, successfully enticed witness Gary Waters to falsely identify Mr. Randolph as the shooter, and furthermore enticed his girlfriend Syreena Clayton to falsely back up his story.

18.    The third and final incident was a double murder at Todd and Pat's Bar on September 19, 2001 by a masked suspect shooting from the bar's entryway. In that incident, it is believed and therefore averred that HPD Investigators, including

---

[2] 373 U.S. 83 (1963).

Carter, Duffin, Heffner, and Lau, successfully enticed witnesses Amahl Scott and Alister Campbell to falsely identify Mr. Randolph as the shooter.

19.     The fabrication and frame-up of Mr. Randolph as the shooter in these three incidents proceeded in reverse chronology.  HPD Investigators responded to the Todd and Pat's Bar incident; identified and abandoned the true culprits in Quendell Oliver and his cohort; procured false identification evidence for the Todd and Pat's Bar incident; and then turned to the Maclay Street Incident and finally the Roebuck's Bar incident, procuring false identification evidence for those incidents as well.

20.     No physical evidence tied Mr. Randolph to these incidents; no disinterested witness ever identified him; and others had far better reasons and capacity to have committed the crimes.

21.     Nonetheless, HPD's unconstitutional behavior directly led to Mr. Randolph's wrongful convictions and death sentence.  As a result, Mr. Randolph spent the next twenty years of his life confined in deplorable conditions on Pennsylvania's death row, awaiting execution for crimes he did not commit.

## September 19, 2001 Murder of Thomas Easter and Anthony Burton at Todd and Pat's Bar and Development of the Oliver Gang as Suspects

22.     On the evening of September 19, 2001, at around 11PM, members of the HPD learned of a double homicide that had occurred at Todd and Pat's Bar, located at 1939 North 6th Street in Harrisburg, Pennsylvania.

23.     Thomas Easter and Anthony Burton died at the bar, having been shot and killed by an unknown assailant.  Alister Campbell, Lakisha Warren, John Brown, Tameka Jackson, and Reginald Gillespie had been injured by gunfire. Amahl Scott, an associate of the decedents, was present but not injured.

24.     Officer Thomas Ryan responded to Harrisburg Hospital, where he interviewed Mr. Campbell, Ms. Warren, and Mr. Brown.  Another officer interviewed Ms. Jackson, who was also present at Harrisburg Hospital.  Investigator David Lau interviewed Mr. Gillespie separately later that evening, as Gillespie had been taken to a Harrisburg Osteopathic, a different local hospital.

25.     None of the witnesses could identify the shooter, except to describe him as a Black male wearing a mask over his face and a black hoodie.

26.     At Todd and Pat's Bar, numerous Harrisburg Police Officers, including Defendants Carter and Lau, were present to begin investigating.

27.     Lieutenant Miller appointed Defendant Carter to be the lead investigator into the case.

28.     Throughout the duration of that investigation, Defendant Fegan held a supervisory position over Defendant Carter and the other assisting HPD officers.

29.     Defendant Fegan reviewed and approved the police reports Defendant Carter submitted during his investigation into this case.  Carter also kept Fegan abreast of proceedings at regular intervals.

30.     It is believed and therefore averred that, generally and in each instance described in this Complaint, Fegan specifically and explicitly approved the tactics utilized by his subordinate HPD officers, including enticing and procuring false identifications extracted from witnesses as described in the paragraphs below.

31.     Defendants Heffner, Duffin, Lau, and other members of the HPD were assigned to assist Defendant Carter.

32.     A few hours after the investigation commenced, Khalil Williams gave a statement to Investigators Carter and Lau.  Mr. Williams told them that a week prior, someone named "Duger" had shot at decedent Easter in the same area.

33.     At approximately 2AM on September 20, 2001, a briefing was held in the conference room of the Dauphin County Criminal Investigation Division. Present were District Attorney Edward Marisco, Deputy District Attorney James Barker, Lieutenant Miller, Investigator Lau, Investigator Massey, Officer Pickles, and Investigator Carter.  At the meeting, the parties discussed the case and available avenues of investigation.

34.     The parties all chose the most promising avenue of investigation: a group of likely suspects comprised of Kevin Pitts, Quendell Oliver, Adeleno Horton, Thomas Logan, and Sharif "Duger" Layton – the same person identified by Khalil Williams as having shot at decedent Easter the week prior.

35.     At around 3:15PM on September 20, 2001, Detective Carter and Investigator Massey went to 1423 Naudain Street, Harrisburg, Pennsylvania, where they interviewed Quendell Oliver.

36.     Mr. Oliver told Investigator Carter that he and Kevin Pitts had been robbed at gunpoint by the decedent Thomas Easter, along with Alister Campbell (who was gravely injured in the Todd and Pat's Bar shooting) and Amahl Scott on September 17, 2001, just two days before the Todd and Pat's Bar shootings.

37.     Mr. Oliver denied committing the murders, but when asked how he felt about Easter and Burton being shot to death, he said "they got what they deserved."

38.     Within an hour, Mr. Oliver's attorney, Spero Lappas, intervened and terminated the interview by invoking Mr. Oliver's rights.

39.     The next day, September 21, 2001, Investigator Carter interviewed Kevin Pitts.  Mr. Pitts confessed that he, Quendell Oliver, Adeleno Horton, and Thomas Logan were searching for Thomas Easter and Alister Campbell and their associates on the night of the Todd and Pat's Bar double homicide.

40.     Mr. Pitts admitted that they were looking to take revenge for a series of assaults and robberies that had been committed against them by Mr. Easter, Mr. Campbell, and their associates prior to the Todd and Pat's Bar shootings; Mr. Pitts admitted that, equipped with firearms, they drove by Todd and Pat's Bar the night of the shootings; and Mr. Pitts even admitted that they had been involved in a shootout nearby with Mr. Scott that same evening.

41.     In the evening of September 21st, Investigator Carter spoke on the phone with Deputy District Attorney Jim Barker.  Mr. Barker and Investigator Carter discussed the evidence thoroughly and agreed to acquire a search warrant, hoping to find the guns used by Adeleno Horton and Quendell Oliver.

42.     The HPD executed the search warrant the next day, September 22, 2001, on Mr. Oliver's home.  There, they found an AK-47 rifle, a .22 caliber pistol, a .22 caliber rifle, a 16-gauge shotgun, numerous bullets of various calibers (including those used in the murder), holsters, $3800.00 in cash, drugs, and a black hooded sweatshirt, a pair of black jeans, and a pair of black sweatpants – the clothing reportedly worn by the shooter in the Todd and Pat's Bar murders.

### The Investigation Stalls, and the HPD Coerce a False Identification by Amahl Scott of Samuel Randolph

43.     While the investigation was focused on Mr. Pitts, Mr. Oliver, and their associates, Investigators Carter, Lau, Duffin, and Heffner were also pursuing Samuel Randolph as a possible suspect, given that he had been in a physical fight with Alister Campbell, and his associate, Gary Waters, in the beginning of September 2001, and therefore might have been looking for revenge.

44.      Although investigators had no evidence directly tying Mr. Randolph to the Todd and Pat's bar shooting,[3] the investigation into Quendell Oliver and his associates had stalled after Mr. Oliver invoked his rights to remain silent and counsel.

45.     Furthermore, none of the decedents' associates – including Alister Campbell, Amahl Scott, and Gary Waters – seemed willing to provide any information regarding Quendell Oliver and his gang.

46.     After all, if Scott, Campbell, and Waters testified against Oliver and his gang, then Oliver and his gang would in turn testify against them, in addition to continuing to extract street justice.

47.     Faced with this roadblock, Investigators Carter, Lau, Duffin, Heffner, and the rest of HPD decided to pursue an altogether easier target, who did not have

---

[3] Or, for that matter, the Roebuck's Bar shooting and Maclay Street shootings that were later also attributed to Mr. Randolph.

the resources for private counsel, the threat of cross-prosecution, or a crew of well-armed associates who would support him.

48.     That target: Samuel Randolph.

49.     An opportunity to bring Mr. Randolph into the case arose a few days later when a potential eyewitness was arrested: Amahl Scott.

50.     Amahl Scott had previously given a statement to Investigators Carter and Duffin on September 19, 2001 stating that he was outside Todd and Pat's bar on the night of the shooting, that he had not seen who had committed the murders, and that he could not identify the shooter.

51.     Knowing that Mr. Scott could potentially be exploited to connect Mr. Randolph to the case, Investigator Carter, Investigator Lau, and others instructed HPD officers to search for Scott, stop him, and make efforts to bring him into custody.

52.     Shortly thereafter, on September 25, 2011, HPD Officers arrested Amahl Scott on unrelated charges.

53.     Sensing an opportunity, Investigator Carter then decided to take the information given to him by Mr. Pitts and Mr. Oliver – that Amahl Scott and Alister Campbell had robbed them at gunpoint on September 17, just days before the shooting at Todd and Pat's bar – and write it up in a formal report.

54.     Despite having received the information weeks prior, this report accusing Amahl Scott of armed robbery was not drafted until October 9, 2001. Sergeant Fegan both "assigned" Investigator Carter to the Pitts robbery, and approved Investigator Carter's report.

55.     The next day, on October 10, 2001, Investigator Carter went to the jail to visit Mr. Scott, accompanied by other members of HPD.

56.     It is believed and therefore averred that Investigator Carter and his associates sought to procure from Mr. Scott an identification of Samuel Randolph as the shooter in the Todd and Pat's bar incident, regardless of the falsity of that identification.

57.     It is believed and therefore averred that Investigator Carter and his associates induced this false identification with assurances that the armed robbery case against Scott would be dismissed; conversely, they assured Scott that if he did not identify Mr. Randolph, he would face harsh treatment in his armed robbery case.

58.     Mr. Scott then swore out a false statement in which he now, for the first time, identified Samuel Randolph as the shooter in the Todd and Pat's bar incident.

59.     Mr. Scott neatly went from unable to make any kind of identification to being the perfect eyewitness: he had seen Mr. Randolph going into the bar before

Randolph put on a mask; he saw Randolph shooting while Randolph was inside the bar; and he saw Randolph coming out of the bar afterwards while adjusting his mask.

60.    Shortly thereafter, on February 27, 2002, the charges against Mr. Scott stemming from the armed robbery of Quendell Oliver were dropped, fulfilling the apparent *quid-pro-quo* with Mr. Scott for his false identification of Samuel Randolph.

61.    Detectives disclosed no details about any link between Mr. Scott's robbery case and his cooperation in the investigation of Mr. Randolph, including his false identification of Mr. Randolph.   But that false identification became the foundation of the Commonwealth's wrongful prosecution of Mr. Randolph for the Todd and Pat's Bar shooting.

62.    Buoyed by this false identification, Investigators Carter, Lau, and other members of the HPD sought to convince the Dauphin County District Attorney's Office to pursue Mr. Randolph as the sole perpetrator of the Easter and Burton murders, casting aside the fact that they had clear evidence tying Pitts, Oliver, and their associates to the murders.

63.    The efforts made by Carter, Lau, and the HPD ultimately succeeded. Indeed, at an October 21, 2001 meeting with Dauphin County Assistant District Attorneys Francis Chardo, Michael Rozman, and others, Investigators Carter, Lau

and other members of the HPD persuaded the District Attorney's Office to set their sights exclusively on Mr. Randolph.

64.     Mr. Randolph was out on bail at the time on unrelated charges after two arrests on September 5 and 28, 2001.

65.     On October 22, 2001, at the request of the Dauphin County Assistant District Attorney's office, the Court of Common Pleas in Dauphin County, Pennsylvania granted the Dauphin County District Attorney's petition to revoke Randolph's bond on those matters.

66.     The Court then issued a capias warrant for Mr. Randolph's arrest.

67.     On November 29, 2001, Mr. Randolph was arrested in Virginia.

68.     On December 12, 2001, Investigator Lau and Investigator Carter drove to Virginia and picked up Mr. Randolph to extradite him back to Dauphin County, where he was held on revoked bond in the local jail.

### The HPD Procured More False Identifications: Maclay Street Incident and Gary Waters

69.     Samuel Randolph remained incarcerated for several months as the HPD attempted to shore up Mr. Randolph's ties to the Todd and Pat's Bar killings.

70.     It is believed and therefore averred that they did so by securing more false identifications from supposed eyewitnesses with the aid of various means of enticement.

71.     In that regard, on February 7, 2002, Gary Waters was arrested on felony drug charges by Investigator Lau and Investigator Heffner.

72.     Mr. Waters had been the victim of a non-fatal shooting on September 3, 2001, which occurred in the vicinity of Maclay Street in Harrisburg, Pennsylvania.

73.     While hanging out with Alister Campbell (a witness in the Todd and Pat's Bar shooting) and Thomas Easter (one of the decedents in Todd and Pat's Bar shooting), Mr. Waters had been approached and shot by an unknown individual.

74.     Mr. Waters had failed to identify anyone to police and had generally refused to cooperate with the investigation into this shooting.  Mr. Waters ignored phone calls and even a certified letter from Investigator Lau, which informed him the case would be closed if Waters did not come forward with more information.

75.     However, on February 7, 2002, after being arrested by Investigator Lau and Investigator Heffner, Mr. Waters had a curious change of heart.

76.     Mr. Waters was taken to the Criminal Investigation Division where Investigators Lau and Heffner interviewed him.

77.     It is believed and therefore averred that Lau and Heffner pressured Mr. Waters to identify Samuel Randolph as the culprit in his shooting.

78.     It is believed and therefore averred that Mr. Waters initially resisted, indicating that he could not truthfully implicate Mr. Randolph in his shooting.

79.     It is believed and therefore averred that Lau and Heffner then offered to assist Mr. Waters in gaining leniency on his drug charges, including assisting him with gaining pretrial release, in exchange for an identification of Mr. Randolph, regardless of the falsity of that identification; conversely, they made clear that if Waters did not assist them, he could expect to receive harsh treatment on his gun and drugs case.

80.     Then, at that meeting, Mr. Waters – for the first time – identified Samuel Randolph as the shooter in the Maclay Street incident.

81.     As direct evidence of this *quid-pro-quo,* Investigator Lau wrote in a police report that Mr. Waters was cooperating with him on "other very serious cases," and that Lau "has no problem with him having ROR bail in reference to this case."

82.     It is believed and therefore averred that this *quid-pro-quo* with Investigators Lau and Heffner also involved Mr. Waters' girlfriend, Syreena Clayton.

83.     Ms. Clayton had a longstanding relationship with Investigator Heffner, as evidenced by her testimony at Mr. Randolph's trial that she "always call[s] Heffner when something goes on with me."

84.     It is believed and therefore averred that at the behest of Investigators Lau and Heffner, Mr. Waters encouraged, enticed, and induced Ms. Clayton to support his false identification of Mr. Randolph as the Maclay Street Incident shooter.

85.     One week after Waters' meeting with Investigators Lau and Heffner, on or about February 14, 2002, Ms. Clayton called Investigator Heffner, set up a meeting with the investigators, and made an identification – her first – of Samuel Randolph as the Maclay Street shooter.

86.     It is believed and therefore averred that they knew Ms. Clayton was identifying Mr. Randolph as part of a cooperation agreement between her boyfriend, Mr. Waters, and Defendants Heffner and Lau, and that her identification was false.

87.     Their own investigation revealed to them that Ms. Clayton could not have identified the shooter, because another witness, Yahimba Cooper, who had the

same vantage point as Ms. Clayton, made clear in a prior police interview that the shooter's face was not visible.

88.     Nonetheless, Investigators Heffner and Lau accepted Ms. Clayton's plainly dubious identification as true.

89.     Based on Mr. Waters' and Ms. Clayton's false identifications Investigators Lau and Heffner persuaded the Dauphin County District Attorney to charge Mr. Randolph for the Maclay Street Incident.

90.     Mr. Waters and Ms. Clayton were the sole witnesses at Mr. Randolph's April 1, 2002 preliminary hearing who identified Mr. Randolph as the Maclay Street Incident shooter.  As a result of their false testimony, Mr. Randolph was bound over for trial.

91.     Neither Investigators Heffner and Lau nor anyone at HPD ever notified the prosecution or the defense of the cooperation agreement involving Mr. Waters and Ms. Clayton.

92.     When he testified, Mr. Waters had an open charge for pistol whipping someone at Roebuck's Bar in September 2001.  One week after Mr. Randolph's preliminary hearing, on April 8, 2001, the pistol-whipping charges against Waters were dismissed.

93.     It is believed and therefore averred that that the dismissal was part of the cooperation agreement between Investigators Lau and Heffner and Mr. Waters and Ms. Clayton.

94.     Without knowledge of the alleged cooperation agreement with Mr. Waters and Ms. Clayton, Mr. Randolph was later convicted at trial of the Maclay Street Incident on Waters' and Clayton's false testimony.

95.     Ms. Clayton's stumbling testimony at Mr. Randolph's trial evinced her inducement by investigators:  She admitted that she could not even see the face of the person shooting the guns in the Maclay Street Incident, but also further testified that she knew—somehow—that it was Samuel Randolph.

**The HPD Coercively Extract More False Identifications: Roebuck's Bar Incident, Ronald Roebuck, and HPD's Attempts to Intimidate Donald Roebuck**

96.     There had been a drive-by shooting outside Ronald Roebuck's bar, the Baby Grand, in Harrisburg on September 2, 2001, where Thomas Easter, Gary Waters and Alister Campbell exchanged gunfire with an unidentified shooter in an automobile outside.

97.     Police spoke to four different potential witnesses:  Ronald Roebuck, the bar's owner, who was inside tending bar at the time of the shooting; and the bar's three bouncers,  Donald Roebuck, Heath Wells and Sean Sellers, who were outside at the time of the drive-by and therefore witnessed the incident.

98.     Donald Roebuck, Mr. Wells, and Mr. Sellers all told police in September that they could not make an identification of the drive-by shooter – the windows were raised in the vehicle, and all three bouncers fled inside when the gunshots began.  The three bouncers also told police that Ronald Roebuck was inside tending bar with another employee, Shannon Taylor, at the time of the shooting and could not have witnessed the shooting himself.

99.     In February – days after extracting a false identification from Gary Waters concerning the Maclay Street shooting – Investigators Lau and Heffner came back to Roebuck's bar and spoke to Donald Roebuck again.

100.    Investigators Lau and Heffner told Donald Roebuck, along with Heath Wells and Sean Sellers, that the three of them needed to identify Samuel Randolph as the shooter inside the vehicle during the drive-by shooting.  Donald Roebuck, Heath Wells, and Sean Sellers again told Investigators Lau and Heffner that they could not identify the shooter in the vehicle, since the windows were up too high and because all three had fled inside quickly after shots began.

101.    Investigators Heffner and Lau refused to take no for an answer.  They were insistent that Samuel Randolph was the perpetrator, and told the witnesses that "one plus one equals two," meaning that if they could pin the drive-by shooting on Samuel Randolph, it would be easier to pin the murders on Mr. Randolph as well.

102.     Despite this pressure, Donald Roebuck, Heath Wells, and Sean Sellers refused to falsely identify Mr. Randolph as the shooter because it was not the truth.

103.     Donald's brother, Ronald, however, was not so principled.

104.     Ronald Roebuck had a longstanding relationship as an informant with the HPD, and specifically with Investigator Heffner.

105.     That relationship involved Ronald Roebuck doing favors for the police in exchange for authorities turning a blind eye to the issues with his own bar.

106.     Ronald Roebuck had not initially come forward to make any identifications because he had been inside the bar at the time of the drive-by shooting and had not seen anything.

107.     However, the HPD and Investigators Lau, Heffner, and Carter wanted to tie Mr. Randolph to the Roebuck's Bar Incident, needed an eyewitness to make an identification, and had been unable to convince the three bouncers – Roebuck, Wells, and Sellers – to falsely identify Mr. Randolph.

108.     It is believed and therefore averred that investigators sought to procure from Ronald Roebuck an identification of Mr. Randolph as the shooter in the Roebuck's Bar Incident during their February 12 meeting, even though they knew he could not truthfully do so.

109.     It is believed and therefore averred that the investigators threatened that if Mr. Roebuck did not implicate Mr. Randolph, Mr. Roebuck would no longer

receive a pass for the criminal and civil liabilities surrounding the operation of his bar; conversely, if Mr. Roebuck gave them the information they wanted, he and his bar would remain safe.

110.   It is believed and therefore averred that Mr. Roebuck agreed to Investigator Lau and Heffner's demands and falsely identified Mr. Randolph, continuing his *quid-pro-quo* relationship with HPD.

111.   Evidence of this corrupt relationship is found in an unrelated incident – a shooting that occurred at Mr. Roebuck's bar on April 2, 2002.

112.   Harrisburg Police Officer Susan Crouser responded to the scene and was approached by Mr. Roebuck, who asked Crouser to try to contact Investigator Heffner and to relay that this incident was related to Mr. Randolph's case.

113.   The incident was plainly unrelated to Randolph's case, considering that Mr. Randolph was in custody at the time.

114.   It is believed and therefore averred that Ronald Roebuck wanted Officer Crouser to contact Investigator Heffner so that he could continue to profit from the cooperation arrangement that was made with Investigators Heffner, Lau, and Carter – namely that he would not face repercussions for issues with his bar so long as he (falsely) identified Samuel Randolph as the shooter in the Roebuck's Bar Incident.

115.    On April 1, 2001, Donald Roebuck and Heath Wells went to the jail in compliance with a subpoena to testify against Mr. Randolph during Mr. Randolph's preliminary hearing on April 1, 2002.

116.    Upon arrival, they were met in the parking lot by Investigator Lau and Investigator Heffner.

117.    Again, Investigators Lau and Heffner told Donald Roebuck and Wells to falsely identify Mr. Randolph as the shooter at the Roebuck's Bar incident.  They told Donald Roebuck and Mr. Wells that they needed to falsely identify Mr. Randolph because it would keep Mr. Randolph in jail, and Randolph needed to be put away.

118.    When Donald Roebuck and Mr. Wells refused, Investigators Lau and Heffner became verbally assaultive, and Investigator Heffner became physically assaultive.  Investigator Heffner began bumping Donald Roebuck in his chest and physically bullying him.

119.    Donald Roebuck and Mr. Wells were steadfast in their refusal to lie for Investigators Lau and Heffner.  As a result, when it became clear that their testimony would not be favorable, Investigator Heffner told them to "get the fuck out of here."

120.     Ronald Roebuck later provided key testimony against Mr. Randolph concerning the Roebuck's Bar incident, as the only actual identifying witness who testified at trial against Mr. Randolph for that incident.

121.     Neither Investigator Heffner nor Investigator Lau nor any member of the HPD disclosed to the prosecution or the defense the apparent cooperation agreement with Ronald Roebuck.

122.     Nor were the attempts to coerce false identification testimony from Donald Roebuck, Mr. Wells, and Mr. Sellers so disclosed.

123.     Nor was the aggressive and assaultive confrontation with Donald Roebuck and Mr. Wells in the jail parking lot so disclosed.

124.     Years later, in late 2003, Mr. Randolph's counsel Samuel Stretton interviewed Donald Roebuck and publicized, by means of a motion for a new trial, the above description of Investigators Lau and Heffner's attempts to force him and other witnesses to falsely identify Mr. Randolph in this case.

125.     Shortly after this motion was filed, on November 6, 2003, Investigator Lau called Donald Roebuck and told him to come to HPD Criminal Investigations Division.  Donald Roebuck came down immediately and met with Investigator Lau. Investigator Lau tried to get Donald Roebuck to change his story and say that his statement was untrue, but Donald refused.

126.    Investigator Heffner was also present and tried to get Donald Roebuck to change his story as well.  Donald again refused.

127.    Investigator Heffner told Donald Roebuck that Heffner had an arrangement with Donald's brother Ronald, and that Donald should talk to Ronald about it.

128.    Despite this campaign of pressure from Investigators Lau and Heffner, Donald Roebuck refused to change his story.

129.    In his police report, however, Investigator Lau describes things differently.  He wrote that:

> Donald also explained that he never said to Stretton that Inv. Heffner asked him to lie at the preliminary hearing.  He said that what he'd actually told Stretton was that *Heffner had asked he and Mr. Wells to tell the absolute truth if called upon to testify* at that hearing and explained the importance of this at the time.[4]

130.    It is believed and therefore averred that this is false, and that Investigator Lau, along with Investigator Heffner, sought to get Donald Roebuck to change his story because it threatened to expose their unlawful behavior in framing Samuel Randolph for the awful crimes of September 2001.

---

[4] Emphasis added.

**The HPD Procures a False Identification of Plaintiff Randolph in the Todd and Pat's Bar Incident**

131.   On March 26, 2002, Alister Campbell was arrested on an arrest warrant for returning fire during the Roebuck's Bar incident.

132.   Mr. Campbell had a gun and drugs on his person at the time of his arrest.

133.   The arrest warrant for returning fire had issued in February of 2002, after Investigator Heffner and other members of the HPD had successfully extracted false identification evidence from Ronald Roebuck, Gary Waters, and Amahl Scott.

134.   It is believed and therefore averred that it was Investigator Heffner's intention to seek a cooperation agreement from Campbell to implicate Mr. Randolph falsely in the Todd and Pat's Bar incident in exchange for help with his gun and assault charges.

135.   Prior to March of 2002, Mr. Campbell had consistently denied knowing the identity of the person who shot him in the Todd and Pat's Bar Incident.

136.   On September 19, 2001, Mr. Campbell told HPD Officer Thomas Ryan that he could not identify the shooter.

137.   On September 20, 2011, Mr. Campbell told HPD Officer Richard Pickles and, separately, Investigator Timothy Carter that he could not identify the shooter.

138.     And on September 24, 2001, Mr. Campbell reaffirmed his inability to identify the shooter in another interview with Investigator Carter.

139.     After being arrested by Investigators Heffner and Lau, Mr. Campbell was interviewed at the jail and continued to insist he could not identify the shooter.

140.     It is believed and therefore averred that Investigators Heffner and Lau enticed and induced Mr. Campbell to give them a statement identifying Samuel Randolph as the shooter, regardless of its falsity and of his many prior denials, and otherwise assisting them as much as possible in their case against Mr. Randolph.

141.     It is believed and therefore averred that Heffner and Lau enticed and induced Mr. Campbell to make this statement by offering, in exchange, assistance in his own pending criminal cases; conversely, if he did not identify Randolph, they made clear he could expect harsh treatment in those matters.

142.     As evidence of the cooperation agreement, Mr. Campbell changed his tune, and told Investigators Heffner and Lau that "he saw everything but won't say without getting some help first."

143.     Mr. Campbell was transported to the Criminal Investigation Division where he met with Investigator Carter.  At around 11:40AM, he began providing a written statement to Investigator Carter, which was completed and signed about 2.5 hours later at 2:15PM.

144.     In that statement, Mr. Campbell gave a completely different story than he had previously, falsely identifying, for the first time, Mr. Randolph as the shooter in the Todd and Pat's Bar Incident.

145.     Mr. Campbell also stated that the shooter was wearing a camouflage jacket and that he had seen Mr. Randolph in the jacket prior; that the shooter fit Randolph's build, when previously he had described the shooter as "shrimpy"; and that he was able to get a good look at the shooters face as he entered the bar and "preceded [sic] to maneuver around, and open fire, the hoody slid back, and the mask only covered the bottom portion of his face."

146.     It is believed and therefore averred that these were not the words of Mr. Campbell, 19-year-old drug dealer, but false facts supplied by Investigators Lau, Heffner, and Carter, to which Mr. Campbell assented only because of the defendants' inducements.[5]

147.     Mr. Campbell, fearing what might happen to him if he did not do all in his power to satisfy the HPD and Investigators Lau, Heffner, and Carter, went even further, providing for the first time an alternate motive for the shooting:  falsely

---

[5] Campbell's statement is rife with obviously coached statements like this, including the final exchange:  "Q. Is there anything else you wish to add to this statement that was not asked?  A. What I do know, is that by all means, Samuel Randolph, is the shooter."

attesting that Mr. Randolph had made a series of phone calls threatening him in the month of August 2001, just before the September shooting.

148.    No independent evidence of such calls was ever presented, and it is believed and thus averred that no such calls were ever made.

149.    On April 15, 2002, Mr. Campbell's felony charges stemming from the Roebuck's Bar Incident were dismissed.  It is believed and therefore averred that this result was part and parcel of Campbell's cooperation agreement with Investigators Carter and Heffner.

150.    The next day, April 16, 2002, Mr. Campbell testified before the grand jury in Samuel Randolph's case, falsely identifying Mr. Randolph as the shooter in the Todd and Pat's Bar incident.

151.    Neither Investigator Heffner nor Investigator Carter nor any other member of the HPD disclosed to the prosecution or the defense the existence of any cooperation agreement with Mr. Campbell or the terms thereof.

### The HPD Fails to Disclose or Investigate an Alternate Suspect Who Confessed to the Crime

152.     In the early morning hours of October 14, 2001, a Johnstown[6] police officer named Eugene Smith learned a piece of critical information: a Johnstown man, Alexander Bush, Jr., had confessed to the double homicide at Todd and Pat's Bar.

153.     Earlier that morning, Officer Smith had met Andrew Stanko.  Mr. Stanko told Officer Smith that a man named Alexander Bush, Jr. had shown Stanko a newspaper clipping of the murder in nearby Harrisburg and told Stanko that he had committed the crime.

154.     Mr. Bush said he used two .45 caliber handguns to commit the murder – consistent with the ballistics testimony from the Todd and Pat's bar murder scene – and that he was wearing a mask like the one described by some eyewitnesses.

155.     Mr. Stanko's report of Mr. Bush's confession was sufficiently concerning that Officer Smith immediately called 911 to get a phone number for the HPD.

156.     At 4 AM, Officer Smith called the HPD and spoke to Sergeant FNU Floyd.  Officer Smith provided Mr. Stanko's full name, address, date of birth, and

---

[6] Johnstown is mid-sized Pennsylvania city about two-to-three hours west of Harrisburg.

phone number, as well as the full name, date of birth, address, and phone number of Mr. Stanko's half-brother at whose home the conversation had allegedly occurred.

157.    Officer Smith put Mr. Stanko on the phone, who spoke directly to Sergeant Floyd and told Sergeant Floyd about Mr. Bush's confession to the crime, including the corroborating details regarding the caliber of the weapons and the type of mask used by the shooter.

158.    Sergeant Floyd entered this information into the Harrisburg Police Information Resource System, forwarded additional information about Mr. Bush to Lieutenant Miller, and notified Investigator Carter of the lead.

159.    It is believed and therefore averred that Investigator Carter notified Defendants Lau, Heffner, and Fagen.

160.    Nonetheless, none of those officers took any action to pursue this lead.

161.    This lead was deliberately ignored because it did not conform to the HPD's plan to prosecute Samuel Randolph for the murders.  Only four days prior, on October 10, 2001, they had successfully extracted a false identification of Mr. Randolph by Mr. Scott.

162.    The HPD deliberately concealed Mr. Bush's confession from the prosecution and from Mr. Randolph.

163.    Indeed, it was not until August 2003 – months after Mr. Randolph was convicted of capital murder and sentenced to death – that then-Chief Deputy

Assistant District Attorney Fran Chardo discovered Sergeant Floyd's report and disclosed it to defense counsel.

### Samuel Randolph is Convicted at Trial on the Strength of the False Identification Testimony

164.    Beginning on May 5, 2003, Mr. Randolph was jointly tried by jury for the drive-by shooting at the Roebuck's Bar, the shooting at Maclay Street, and the murders at the Todd and Pat's Bar.

165.    No physical evidence connected Mr. Randolph to any of these three incidents.

166.    Nor did the ballistics evidence indicate that the same firearm was used in all three.  To the contrary, the Commonwealth's ballistics expert testified that he was "unable to establish a link between any of the three scenes" and that, had the same gun been used, he likely would have been to establish such a link.

167.    The sole testimony tying Mr. Randolph to these crimes were the false identifications of Mr. Scott, Mr. Waters, Ms. Clayton, Ronald Roebuck, and Mr. Campbell, as detailed in the paragraphs above.

168.    On May 14, 2003, Mr. Randolph was convicted of two counts of first-degree murder as well as attempted murder and related offenses concerning the Roebuck's Bar and Maclay Street shootings.

169.    The next day, May 15, 2003, Mr. Randolph was sentenced to death.

170.    After a long and circuitous process through the appellate, post-conviction, and federal habeas systems, Mr. Randolph was finally granted a new trial by Chief District Judge Christopher Connor in the Middle District of Pennsylvania on May 26, 2020 – nearly 17 years to the day after the original conviction.[7]

171.    The Dauphin County District Attorney's Office appealed the decision, which was subsequently affirmed on July 20, 2021 by the Third Circuit in a published, precedential ruling.

172.    The Dauphin County District Attorney's Office then petitioned the United States Supreme Court for review.

173.    Notably, during the federal appellate process, the Dauphin County District Attorney's Office made Mr. Randolph an offer: enter an *Alford*[8] plea and receive a time-served sentence, which would both permit him to maintain his innocence and ensure his release.

174.    Mr. Randolph declined, stating: "I didn't do this.  Innocent people don't plead guilty – as bad as I want to go home."[9]

175.    The Supreme Court denied certiorari.

---

[7] The decision granting the habeas petition was based on Sixth Amendment issues involving Mr. Randolph's right to be represented by counsel of his choice.

[8] *North Carolina v. Alford*, 400 U.S. 25 (1970).

[9] Becky Metrick, Jenna Wise, *Once sentenced to death, Harrisburg man granted release from prison, says he's innocent of double murder*, PENNLIVE PATRIOT NEWS, (Apr. 7, 2021), https://www.pennlive.com/news/2022/04/once-sentenced-to-death-harrisburg-man-released-from-prison-says-hes-innocent-of-double-murder.html

176.    Mr. Randolph's case was remanded to the Dauphin County Court of Common Pleas for retrial.

177.    The Dauphin County District Attorney's Office moved for a *nolle prosequi* in the Court of Common Pleas on April 6, 2022, which was granted by the Court on April 12, 2022.  Thereby, all charges against Mr. Randolph were dismissed.

### Allegations Regarding Municipal Liability:[10]
### The HPD's Pattern and Practice of Unconstitutional
### Misconduct in Homicide Investigations

178.    It is believed and therefore averred that, for decades before the investigation leading to Mr. Randolph's murder convictions, and for years following it, the City of Harrisburg had in force and effect a policy, practice, and custom of unconstitutional misconduct in homicide investigations.

179.    It is believed and therefore averred that this policy, practice, or custom involved detaining, arresting, and interrogating purported witnesses in criminal investigations, without legal cause and with the intent of coercing statements – true or false – from these persons, under threat of punishment or other sanctions or for material benefits.   These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and / or their attorney sought the right to consult

---

[10] The allegations in this section are also pled in support of Mr. Randolph's claims of supervisory liability against Defendant Fegan.

with counsel.   Exculpatory evidence obtained during these detentions and interrogations was concealed by the HPD from the Dauphin County District Attorney's Office, other prosecuting agencies, and the defense.   The tactics used were coercive through threats of harm and incentives of leniency, and those coercive tactics were not disclosed to prosecutors and / or defense attorneys, in clear denial of defendants' constitutional due process rights.

180.   It is believed and therefore averred that, at the time of the investigation leading to Mr. Randolph's murder convictions, these practices had long been well known to the City of Harrisburg and its policymakers due to newspaper investigations (including the nationally renowned work of Pete Shellem, sometimes referred to as the "one-man innocence project"[11] with the Harrisburg newspaper *The Patriot-News*), governmental investigations, complaints from lawyers and civilians, and internal police investigations.

181.   It is believed and therefore averred that various cases demonstrate that this misconduct was pervasive within the HPD at the time of the investigation leading to Mr. Randolph's murder convictions.

---

[11] Mario Cattabiani, *The Sleuth: Pete Shellem of Harrisburg's Patriot-News has freed four people from jail through dogged, old-fashioned reporting*, AMERICAN JOURNALISM REVIEW (June-July 1997).

182.    It is believed and therefore averred that the misconduct described below was committed with the knowledge of and in full view of HPD supervisors, and because of – at the very least – their deliberate indifference to it.

183.    Indeed, each instance of unconstitutional misconduct described above was reviewed and sanctioned by at least one, if not more than one, HPD supervisors.

184.    It is believed and therefore averred that, instead of disclosing this misconduct to prosecutors, the HPD supervisors concealed it themselves and either: (a) ordered their supervisees – e.g., Lau, Heffner, Carter, and Duffin – to conceal it; (b) encouraged their supervisees to do the same; or (b) did not affirmatively encourage their supervisees to disclose it.

### HPD's Longstanding Pattern and Practice of Coercing Witness Testimony and / or Concealing Witness Inducements

185.    The extensive misconduct in Mr. Randolph's cases alone suffices to establish that the City of Harrisburg – a city that for decades has had no more than 50,000 residents and has had no more than 22 homicides per year since 1989[12] – had a custom, policy, or practice of unconstitutional misconduct in homicide and attempted homicide prosecutions at the time of the investigation into the incidents for which Randolph was wrongfully prosecuted.

---

[12]Christine Vendel, *Harrisburg Killings Drop in 2021, Defying National Trend*, PENNLIVE PATRIOT NEWS (Jan. 5, 2022), https://www.pennlive.com/news/2022/01/harrisburg-killings-drop-in-2021-bucking-national-trend.html

186.     Indeed, as detailed above, the City of Harrisburg and the HPD, through the actions of Lau, Heffner, Carter, Duffin, and other HPD officers, worked assiduously to wrongfully convict Mr. Randolph in three different cases by: (a) deploying coercive tactics to attempt to secure false identifications of Mr. Randolph from numerous alleged witnesses, and concealing those tactics and the falsity of the identifications; and (b) turning a blind eye to compelling evidence implicating alternative suspects (e.g., Alexander Bush Jr.'s confession), which they also concealed.

187.     It is believed and therefore averred that comparable misconduct in cases spanning two decades – from 1995 through 2011 – only serves to fortify this conclusion.

<u>The Wrongful Prosecution and Conviction of Lorenzo Johnson</u>

188.     In March 1997, Lorenzo Johnson was wrongfully convicted as an accomplice to first degree murder in Harrisburg, Pennsylvania, in Dauphin Court of Common Pleas case Commonwealth v. Lorenzo Johnson (1544 CR 1996).

189.     The case stemmed from the December 1995 shooting death of Tarajay Williams outside of a Harrisburg bar.

190.     HPD Detective Duffin was intimately involved in the investigation of the case and dealt with numerous witnesses.

191.    Suquan Ripply was an alibi witness for Mr. Johnson and was interviewed by Detective Duffin during his investigation.  Initially, Mr. Ripply told the truth:  he had been with Mr. Johnson out-of-state on the night of the murder.

192.    Then, Detective Duffin threatened Mr. Ripply to change his story and inculpate Mr. Johnson.  Detective Duffin told Mr. Ripply to "be more vague" about Mr. Ripply's memory of the actual date of the trip.  Detective Duffin told Mr. Ripply that if he refused, Detective Duffin would personally see that Mr. Ripply was indicted on federal charges and that a separate pending sentence of Mr. Ripply's would be imposed in full, exposing Mr. Ripply to seven or eight more years in prison.  If Ripply did testify favorably for Detective Duffin, then Detective Duffin would help him out.

193.    Detective Duffin also sought to intimidate another key alibi witness: Theresa Thomas.  Ms. Thomas told Detective Duffin that Mr. Johnson was not in Harrisburg on the date of the incident and therefore could not have committed the crime, as Mr. Johnson had called her from New York.

194.    Detective Duffin, in response, told her that if she testified to that at trial, he would ensure she was charged with perjury.  When Ms. Thomas persisted, indicating that phone records would prove it, Detective Duffin went one step further and explained that if she testified to that at trial, he would make sure her kids were taken away from her by Child Protective Services.

195.    As here, Detective Duffin's attempts at coercion and intimidation were not disclosed to the prosecution or the defense.

196.    As here, those failures led to Mr. Johnson's wrongful prosecution, conviction, and decades of incarceration.

197.    Detective Duffin's misconduct, once disclosed, played an instrumental role in securing a new trial for Mr. Johnson and, ultimately, his release.

### The Wrongful Prosecution of Sean Primm

198.    Sean Primm was tried for murder in May of 2007 in Harrisburg, Pennsylvania, in Dauphin Court of Common Pleas case *Commonwealth v. Sean Primm* (3915 CR 2006).

199.    Mr. Primm's murder case was investigated by the HPD.  Investigator Heffner was the lead detective on the case; Investigator Lau assisted.

200.    Three witnesses identified Mr. Primm as the shooter.  Each was facing criminal charges at the time of their testimony.

201.    Michael Collier initially told Harrisburg Police Officers that he did not know anything about the murder and hadn't seen anything.

202.    Later, while Mr. Collier was in custody and facing a probation revocation hearing pending and escape charges, Investigator Heffner interviewed him.

203.    Mr. Collier then told Investigator Heffner at that time and later testified at trial that he overheard Mr. Primm admitting that he shot the victim.

204.    It is believed and therefore averred that Mr. Collier did not hear Mr. Primm admit to anything and that this evidence and testimony were fabricated due to the intervention of Investigator Heffner.

205.    It is believed and therefore averred that Mr. Collier changed his story to falsely implicate Sean Primm because Investigator Heffner offered him leniency with respect to his treatment at the jail, his pending criminal cases, and his pending probation revocation, and because Investigator Heffner suggested harsh treatment should Primm not falsely implicate Primm.

206.    Leroy Santos testified that he witnessed Mr. Primm commit the shooting and that he had not initially come forward to police.

207.    Mr. Santos was confused at trial about almost all his testimony, but he was – entirely unprompted – able to provide Investigator Heffner's name and badge number.

208.    Mr. Santos admitted that he had a pending criminal charge at the time of his testimony.

209.    It is believed and therefore averred that Mr. Santos did not actually witness Mr. Primm commit the shooting.

210.    Mr. Santos met with Investigator Heffner prior to his testimony.

211.     It is believed and therefore averred that, as a result of Investigator Heffner's encouragement, Santos falsely implicated Mr. Primm in the shooting.

212.     It is believed and therefore averred that Investigator Heffner procured this false testimony by promising Mr. Santos leniency in his pending criminal charge and by suggesting harsh treatment if Mr. Santos did not comply with his Heffner's determination to prosecute Prim regardless of the truth.

213.     Samuel Williams initially told HPD officers that a Spanish male[13] committed the crime and said that he would be unable to make any positive identification.

214.     Subsequently, he was arrested for receiving stolen property and escape by officers from the HPD.

215.     As with the other witnesses, Investigator Heffner and other officers met with Williams while he was subject to criminal prosecution.  As with the other witnesses, Mr. Williams only then identified Mr. Primm as the shooter, selected his photo out of a lineup, and subsequently testified at trial identifying Mr. Primm.

216.     It is believed and therefore averred that Mr. Williams did not actually witness Mr. Primm commit the crime, but saw a Spanish male and falsely identified Mr. Primm due to the coercive intervention of Investigator Heffner during their

---

[13] Mr. Primm is not a Spanish male.

meeting, where it is believed that offers of leniency and suggestions of harsh treatment were conveyed.

217.    As here, neither Investigator Heffner nor any other member of the HPD disclosed their cooperation agreements with Collier, Santos, or Williams to the prosecution or the defense.

218.    A defense witness, Joseph Moore, who had also been incarcerated with Mr. Primm, testified on Mr. Primm's behalf at the trial and contradicted the jailhouse informant Michael Collier's testimony.

219.    Mr. Moore told the jury that he was present at the time when Mr. Primm was alleged to have confessed his crime to Mr. Collier, and that no such confession had occurred.

220.    Notably, Mr. Moore told the jury that he had been visited by Investigator Heffner, and although Mr. Moore did not go into detail, he described the visit as Investigator Heffner "basically trying to get me to say whatever he wanted me to say."

221.    In Sean Primm's case, notwithstanding the investigators' efforts, the jury discounted the testimony of the compromised witnesses and Primm was found not guilty of criminal homicide and related charges in 2007.

The Wrongful Prosecution and Conviction of Larry Trent Roberts

222.    On November 14, 2007, Larry Trent Roberts was wrongfully convicted of murder and related offenses in Harrisburg, Pennsylvania, stemming from the 2005 killing of Duwan Stern.

223.    Investigator David Lau was the lead investigator for the HPD.

224.    At the outset, none of the witnesses involved identified Mr. Roberts as the person involved in the shooting.

225.    Initial descriptions of the shooter varied substantially from Mr. Roberts' appearance, most prominently varying in weight by over 100 pounds.

226.    It is believed and therefore averred that Investigator Lau nonetheless pursued Mr. Roberts as a suspect due to his own personal history with Roberts.

227.    Initially, every witness failed to pick Mr. Roberts out of line-ups shown to them by Investigator Lau.

228.    Other evidence pointed to other culpable parties, and cellular telephone records went further, directly exculpating Mr. Roberts.

229.    Nevertheless, Investigator Lau persisted in developing a case against Mr. Roberts.

230.    The three chief witnesses for the state – Thomas Mullen, Tony Ebersole, and Layton Potter— all had various open and pending charges against them when they gave statements.

231.    It is believed that therefore averred that in Mr. Robert's case, as in the other cases outlined in the complaint and as here, Investigator Lau used those open charges as a tool to procure false identifications of Mr. Roberts as the gunman.

232.    It is believed and therefor averred that the witnesses were given assurances of favorable treatment in exchange for implicating Mr. Roberts, and that these witnesses were given assurances of harsh treatment if they did not implicate Roberts.

233.    Mr. Mullen and Mr. Ebersole testified at trial that they had witnessed the shooting and identified Mr. Roberts, while Mr. Potter testified as an informant that he had overheard Mr. Roberts confessing to the crime while incarcerated.

234.    It is believed that therefore averred that Investigator Lau also influenced one other witness, Sonya Anderson, to change her testimony.

235.    Ms. Anderson intended to provide favorable testimony for Mr. Roberts pointing to an alternate suspect.

236.    It is further believed and thus averred that, after Investigator Lau learned of this proposed testimony, Lau met with her and, with threats of potential prosecution should she undercut the (false) narrative that Mr. Roberts was the shooter, sought to convince her to recant her statement exculpating Roberts.

237.    Lau's efforts were successful: Ms. Anderson recanted and did not testify at trial.

238.    Based largely on the false testimony of Mr. Mullen, Mr. Ebersole, and Mr. Potter, Mr. Roberts was convicted of first-degree murder and sentenced to life without parole.

239.    Neither Investigator Lau nor any other HPD officer disclosed to the prosecution or the defense these efforts to obtain false inculpatory statements and deter exculpatory testimony.

240.    In June of 2017, Mr. Roberts' murder conviction was vacated, and at a subsequent retrial in 2019, Mr. Roberts was found not guilty of all charges and released.

### The Wrongful Prosecution and Conviction of Dennis Robinson

241.    On October 6, 2011, Dennis Robinson was convicted of first-degree murder and related offenses in the Dauphin Court of Common Pleas case *Commonwealth v. Dennis Robinson* (549 CR 2010).

242.    The case stemmed from the 2009 killing of Jermaine Dawson in Harrisburg.

243.    The only witness to identify Mr. Robinson as the shooter was Eric Greene, who was an early suspect in the case and initially denied seeing the shooting.

244.    Mr. Greene was questioned on more than four occasions by various HPD Detectives and Investigators.

245.     Detective Brinker, the lead investigator, interrogated Mr. Greene on several separate occasions.

246.     Mr. Greene's story changed frequently.

247.     However, Mr. Greene ultimately testified at trial that he watched Mr. Robinson shoot Mr. Dawson to death on the night in question, and further that he had seen Mr. Robinson with the murder weapon prior to the incident date.

248.     It is believed that therefore averred that Mr. Greene's testimony was false, the product of manipulation by Detective Brinker.

249.     At the time of his testimony, Mr. Greene had pending criminal charges stemming from three separate arrests, with a total exposure of 91 years' imprisonment.

250.     It is believed that therefore averred that, with the aid of other HPD investigators, Detective Brinker procured false inculpatory testimony from Mr. Greene with suggestions and direct offers of favorable treatment in his criminal matters, and with suggestions and direct threats of harsh treatment should Mr. Greene not falsely implicate Mr. Robinson.

251.     Not only did Detective Brinker remain silent and fail to disclose any feature of the cooperation agreement with Mr. Greene to the Dauphin County District Attorney's Office or the defense, but he explicitly denied the *quid-pro-quo* deal when questioned at Mr. Robinson's trial.

252.    On January 20, 2011, Mr. Greene entered a consolidated "no-contest" plea to all three of his cases and received a sentence of two-to-four-years, with credit for time served – far below the 91 years to which he was exposed.

253.    In 2021, Mr. Greene signed a declaration clarifying that he only identified Mr. Robinson because of the *quid-pro-quo* agreement he had received – but that was not ever disclosed – for leniency in his own pending criminal cases.

254.    As with the other cases outlined in this Complaint and as in Mr. Randolph's cases, neither Detective Brinker nor anyone with the HPD disclosed the full extent of their communications, agreements, and understandings with respect to a critical Commonwealth witness to the prosecution or the defense.

\*\*\*

255.    Thus, before, during, and after Mr. Randolph's prosecution, the City of Harrisburg and the HPD had a policy, practice, or custom of: (a) utilizing "carrots" (leniency) and / or "sticks" (increased severity) to extract from witnesses false statements implicating others in homicide and attempted homicide cases; and (b) subsequently concealing such behavior.

256.    This policy, practice, or custom continued for years due to the conscious intent of the HPD and the deliberate indifference of the City of Harrisburg to this policy, practice, or custom.

257.    The policies of the City of Harrisburg and the HPD today only underscore these realities.  Indeed, as of the date of this filing, the HPD still does not have in place a policy or any clear guidance on disclosing exculpatory information regarding witnesses; disclosing impeachment information regarding witnesses; disclosing exculpatory information in affidavits; promising leniency or making other inducements to witnesses; or promising increased severity or other negative inducements to witnesses.

258.    Accordingly, at the time of the investigation and prosecution of Mr. Randolph, the City of Harrisburg and the HPD had a practice, policy, or custom of:

a)  Procuring false evidence and testimony, including identification of suspects in homicide and attempted homicide cases;

b)  Inducing the witnesses under separate criminal charges or other coercive governmental actions to provide false testimony (or not to testify at all) through incentives related to leniency or favorable treatment in those matters;

c)  Systematically and deliberately failing to disclose to prosecutors and defense counsel their activities in sections (a) and (b), *supra*;

d)  Failing to properly train and supervise officers on the constitutional limitations on their investigative, detention, arrest, and other powers;

e) Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilian's rights during police investigation and prosecution of criminal suspects, including the coercion of witnesses, fabrication and falsification of evidence, and suppression of exculpatory and impeachment evidence; and

f) Failing to properly sanction or discipline Harrisburg Police Officers who are aware of and conceal and / or aid and abet violations of constitutional rights of individuals by other Harrisburg Police Officers, thereby causing and encouraging Harrisburg Police Officers, including defendant officers in this case, to violate the rights of citizens such as Mr. Randolph;

**Damages**

259.   The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Harrisburg caused Mr. Randolph to be improperly arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve 20 years in prison for a crime he did not commit.

260.   As a direct result of Defendants' conduct and omissions, Mr. Randolph sustained injuries and damages, including loss of freedom and youth for nearly 20 years, pain and suffering, mental anguish, emotional distress, indignities,

degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom, including, but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

261.   As a direct result of Defendants' conduct and omissions, Mr. Randolph was deprived of his familial relationships, romantic relationships, and friendships.

262.   As a direct result of Defendants' conduct and omissions, Mr. Randolph sustained economic injuries and damages, including loss of income and loss of career opportunities.

263.   As a direct result of Defendants' conduct and omissions, Mr. Randolph sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983: Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments (against all individual defendants)

264.    Plaintiff incorporates the preceding paragraphs by reference.

265.    The individual defendants, acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Randolph for the September 19, 2001 murders and the September 2 and 3 shootings, intentionally caused Mr. Randolph to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Randolph's clearly established Fourth and Fourteenth Amendment rights to be free from prosecution without probable cause.

266.    The individual defendants, acting individually and in concert, knowingly and intentionally caused others to fabricate evidence for the purpose of supporting unwarranted criminal charges, and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

267.    The individual defendants performed the above-described acts under color of state law intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Randolph's clearly established constitutional rights. No reasonable officer in 2001 would have believed this conduct was lawful.

268.    The prosecution finally terminated in Mr. Randolph's favor on April 12, 2022, when the Court of Common Pleas for Dauphin County accepted the Commonwealth's request to *nolle prosequi* the case against Mr. Randolph, thereby dismissing all charges.

269.    The individual defendants' acts and omissions described in the preceding paragraphs were the direct and proximate cause of Mr. Randolph injuries, because they knew or should have known that their conduct would result in the wrongful arrest, charging, prosecution, conviction, and incarceration of Mr. Randolph.

## COUNT II

**42 U.S.C. § 1983: Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation** (against all individual defendants)

270.    Plaintiff incorporates the preceding paragraphs by reference.

271.    The individual defendants, acting individually and in concert, and within the scope of their employment with the HPD, deprived Mr. Randolph of his clearly established right to due process of law and a fair trial by fabricating inculpatory evidence and deliberately using coercion, enticement, and / or suggestion to obtain false and dishonest inculpatory witness statements, including, without limitation, the false statements of Gary Waters, Alister Campbell, Syreeta Clayton, Amahl Scott, and numerous others.

272.    The individual defendants deprived Mr. Randolph of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and the defense, including, without limitation, information regarding the inducements provided to, and fabricated testimony provided to, numerous witnesses in the case.  Defendants also withheld information that another individual, Alexander Bush, had confessed to the murder.

273.    The individual defendants deprived Mr. Randolph of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to duly investigate the involvement of Quendell Oliver and his associates, as well as Alexander Bush and his confession for the crime.

274.    The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Randolph clearly established constitutional rights.  No reasonable officer in 2001 would have believed this conduct was lawful.

275.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Randolph's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Randolph's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III

**42 U.S.C. § 1985: Civil Rights Conspiracy** (against all individual defendants)

276.     Plaintiff incorporates the preceding paragraphs by reference.

277.     The individual defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Randolph of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and his right to a fair trial.

278.     In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.  Suggesting, coercing, and / or fabricating false and dishonest inculpatory evidence in the form of witness statements;

b.  Intentionally or with deliberate indifference failing to comply with their duty to disclose exculpatory and impeachment material during the pendency of this case;

c.  Wrongfully prosecuting Mr. Randolph while knowing that they lacked probable cause; and

d.  Committing and suborning perjury during hearings and trials.

279.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Randolph's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Randolph's wrongful arrest, charging, prosecution, conviction, and incarceration.

## COUNT IV
**42 U.S.C. § 1983: Failure to Intervene** (against all individual defendants)

280.    Plaintiff incorporates all the preceding paragraphs by reference.

281.    By their conduct and under color of state law, the individual Defendants, acting within the scope of their employment with the HPD, had opportunities to intervene on behalf of Mr. Randolph to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law.  Yet, with deliberate indifference, they declined to do so.

282.    These Defendants' failures to intervene violated Mr. Randolph's clearly established constitutional right to be free from unreasonable search and seizure, and not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth, and Fourteenth Amendments.

283.    No reasonable police officer in 2001 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and / or direct suggestion to obtain false witness statements, withholding material exculpatory and / or impeachment evidence, deliberately

failing to conduct a constitutionally adequate investigation, and causing Mr. Randolph to be arrested, prosecuted, convicted, and sentenced without probable cause were lawful.

284.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Randolph's injuries. Defendants knew, or should have known, that their conduct would result in Mr. Randolph's wrongful arrest, charging, prosecution, conviction, and incarceration.

**COUNT VI**
**42 U.S.C. § 1983: Supervisory Liability** (against Defendant Fegan)

285.    Plaintiff incorporates the preceding paragraphs by reference.

286.    Defendants acted with impunity in an environment in which they were inadequately trained, supervised, and / or disciplined by Defendant Fegan, both in this case and as a matter of practice and custom.

287.    Defendant Fegan acted recklessly and with deliberate indifference to Mr. Randolph's constitutional rights by failing to adequately train, supervise, and discipline the HPD investigators assigned to this investigation, thereby allowing and causing these detectives to deprive Mr. Randolph of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and his right to a fair trial.

288.    Defendant Fegan was both personally involved in the investigation of Mr. Randolph and directly supervised the investigative acts taken by Investigators Carter, Lau, Heffner, and Duffin.

289.    Defendants Fegan, as a supervisor in the HPD's Criminal Investigation Division, affirmatively encouraged the use of unconstitutional investigative tactics by, for example, instructing his subordinates to employ such tactics, commending his subordinates for "solving" cases through use of such tactics, and refusing to discipline his subordinates for employing such tactics, although he knew of or was deliberately indifferent to their use of such tactics.

290.    The reckless and deliberately indifferent conduct of Fegan violated his clearly established duty in 2001 to supervise the other individual defendants.  No reasonable police supervisor in 2001 would have believed that reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

291.    The acts and omissions of Fegan, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Randolph's injuries. Defendants Fegan knew, or should have known, that his conduct would result in Mr. Randolph's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT VI
**42 U.S.C. § 1983: Municipal Liability** (against Defendant City of Harrisburg)

292.     Plaintiff incorporates the preceding paragraphs by reference.

293.     By and through its final policymakers, the City of Harrisburg had in force and effect during the time of Mr. Randolph's wrongful arrest and conviction – and for many years preceding and following this investigation – a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including, in particular: the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding witnesses and suspects details about the crime; and the withholding of exculpatory and impeachment evidence from the prosecution and the defense.

294.     The City of Harrisburg's final policymakers had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were withholding exculpatory and impeachment evidence and fabricating inculpatory evidence (e.g., fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding witnesses and suspects details about the crime). Despite being on notice of these unconstitutional practices, policies, or customs, the

City of Harrisburg failed to take appropriate remedial and / or disciplinary actions to curb this pattern of misconduct.

295.    Such unconstitutional municipal customs, practices, and / or policies were the moving force behind Mr. Randolph's false arrest, charging, prosecution, and 20 years of incarceration on death row, as well as the other injuries and damages set forth above.

## COUNT VII
**Malicious Prosecution under Pennsylvania Law** (against all individual defendants)

296.    Plaintiff incorporates the preceding paragraphs by reference.

297.    The defendants, acting alone, jointly, and / or in concert and conspiracy knowingly, intentionally, maliciously, and / or recklessly caused, initiated, or continued proceedings against Mr. Randolph without probable cause, and the proceedings ultimately terminated in Mr. Randolph's favor on April 12, 2022, when the Pennsylvania Court of Common Pleas for Dauphin County accepted the Commonwealth's motion to *nolle prosequi* the case against Mr. Randolph and thereby dismissed all charges.

298.    As a result of this malicious prosecution, Mr. Randolph sustained the injuries and damages set forth above.

### COUNT VIII
**Outrageous Conduct Causing Severe Emotional Distress under Pennsylvania Law** (against all individual defendants)

299.   Plaintiff incorporates the preceding paragraphs by reference.

300.   Defendants, acting alone, jointly, and / or in concert and conspiracy, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Mr. Randolph.

301.   The acts or omissions of the defendants as alleged in the preceding paragraphs constitute the tort of Outrageous Conduct Causing Severe Emotional Distress, all to Mr. Randolph's great detriment and loss.

302.   As a result of the defendants' conduct, Mr. Randolph suffered and continues to suffer damages as described above.

### COUNT IX
**Civil Conspiracy under Pennsylvania Law** (against all individual defendants)

303.   Plaintiff incorporates the preceding paragraphs by reference.

304.   Defendants acting alone, jointly, and / or in concert and conspiracy committed tortious and other unlawful acts against Mr. Randolph, including malicious prosecution and outrageous conduct causing severe emotional distress. *See* Counts I through VIII, *supra*.

305.   As a result of the defendants' conduct, Mr. Randolph suffered and continues to suffer damages as described above.

## RELIEF DEMANDED

WHEREFORE, Samuel Randolph respectfully requests that the Court grant the following relief:

A.     A declaratory judgment that Defendants violated Mr. Randolph's rights under the Fourth, Fifth, and Fourteenth Amendments and Pennsylvania law;

B.     An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

C.     An award of nominal damages against all Defendants in an amount to be determined by the finder of fact;

D.     An award of punitive damages against all Defendants except the City of Harrisburg in an amount to be determined by the finder of fact;

E.     Reasonable attorney's fees and costs; and

F.     Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

/s/ Cary London
SHULMAN & HILL, PLLC
Cary London, Esq.*
C. Cass Luskin, Esq.*
1 State Street Plaza, 15th Floor
New York, NY 10004
(212) 221-1000
Cary@shulman-hill.com
CCass@shulman-hill.com

*Pro hac vice petition forthcoming

/s/ Karl Schwartz
WISEMAN & SCHWARTZ, LLP
Karl Schwartz, Esq. (Pa. No. 38994)
Alan Tauber, Esq. (Pa. No. 57353)
Jon Cioschi, Esq. (Pa. No. 318793)
718 Arch Street, 702N
Philadelphia, PA 19106
(215) 360-3988
atauber@atauberlaw.com
cioschi@wisemanschwartz.com