IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAMUEL RANDOLPH,                        :
                                        :
                    Plaintiff.          :
                                        :
            v.                          :   Docket No.  22-CV-01239
                                        :
CITY OF HARRISBURG, et al.,             :
                                        :
                    Defendants.         :

**JOINT CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF
DEFENDANTS, ROBERT FEGAN, DAVID LAU, DONALD HEFFNER,
KEVIN DUFFIN'S AND CITY OF HARRISBURG'S MOTIONS FOR
<u>SUMMARY JUDGMENT</u>**

Defendants, the City of Harrisburg ("Harrisburg" or "the City"), and Sgt.

Robert Fegan, Detective David Lau, and Investigators Donald Heffner and Kevin

Duffin (hereinafter collectively referred to as "Defendant Officers") respectfully

submit this Concise Statement of Facts ("JSOF") in support of their Motions for

Summary Judgment pursuant to the Scheduling Order (ECF 67) and the Local

Rules of This Court.[1]

1.      Defendant Sgt. Robert Fegan (hereinafter individually referred to as

"Sgt. Fegan") was at all times relevant employed as a law enforcement officer with

the City of Harrisburg Bureau of Police. *See* ECF 1, ℙ 7; *see also* ECF 21 ℙ 7.

While in a supervisory position, Sgt. Fegan was not the supervisor of the

---

[1] The City of Harrisburg and Defendant Officers submit this joint statement of facts
together, but will be filing separate Motions for Summary Judgment.

investigations of the three shooting incidents in September 2001 referenced in the Complaint. *See*, deposition transcript of (ret.) Sgt. Fegan, attached here as Exhibit "A" at 13 (JA 0014).

2.      Defendant Investigator David Lau (hereinafter individually referred to as "Inv. Lau") was at all times relevant employed as an investigator with the City of Harrisburg Bureau of Police. *See* ECF 1, ℙ 8, *see also* ECF 21 ℙ 8. *See also* deposition transcript of Inv. Lau, attached hereto as Exhibit "B" at 7:5-20 (JA 0062).

3.      Defendant Investigator Donald Heffner (hereinafter individually referred to as "Inv. Heffner") was at all times relevant employed as an investigator with the City of Harrisburg Bureau of Police. *See* ECF 1, ℙ 9; *see also* ECF 21 ℙ 9. *See also* deposition transcript of Inv. Heffner, attached hereto as Exhibit "C" at 6:7-7:7 (JA 0147-0148).

4.      Defendant Investigator Kevin Duffin (hereinafter individually referred to as "Inv. Duffin") was at all times relevant employed as an investigator with the City of Harrisburg Bureau of Police. *See* ECF 54, ℙ 10; *see also* ECF 21 ℙ 11. *See also* deposition transcript of Inv. Duffin, attached hereto as Exhibit "D" at 6:13-22 (JA 0247).

5.      Defendant City of Harrisburg (hereinafter "City" or "City of Harrisburg") was at all times relevant a municipality located in the Commonwealth

of Pennsylvania and employer of Defendant Officers. *See* ECF 1, ⁋ 6; *see also* ECF 21 ⁋ 6.

**<u>Drive-by Shooting at Roebuck's Bar and Investigation</u>**

6.      In the early morning hours of September 2, 2001, a drive-by shooting occurred at a bar called the Baby Grand, owned by Ronald Roebuck (the "Baby Grand" or "Roebuck's Bar") in which Gary Waters was injured and several vehicles were struck. *See* ECF 1, ⁋ 16; ECF 21 ⁋ 16; *see also* Initial Crime Report for Incident No. 2001-09-00422, attached hereto as Exhibit "E" at 1 (JA 0289).

7.      Officer Todd Abromitis arrived at the scene and interviewed several people. Exhibit E at 1-2 (JA 0289-0290).

8.      Donald Roebuck told Ofc. Abromitis that a dark colored Saturn drove up, stopped, and started shooting at a "group of guys" standing across the street. Exhibit E at 1 (JA 0289).

9.      The group of guys included Gary Waters, Alister Campbell and Ronald Collins. *See* the Supplemental Report regarding Incident No. 2001-09-00422, attached hereto and incorporated herein as Exhibit F at 1 (JA 0302).

10.      At least one member of the group returned fire and the Saturn drove off. Exhibit E at 1 (JA 0289).

11.      Donald Roebuck told Ofc. Abromitis that he had heard that Samuel Randolph was the shooter in the Saturn. Exhibit E at 1 (JA 0289).

12. Another individual who refused to provide his identity also informed Ofc. Abromitis that Randolph was the shooter in the Saturn. Exhibit E at 2 (JA 0290).

13. Inv. Heffner was the principal lead investigator for this shooting, which was assigned Incident No. 2001-09-00422 ("Roebuck's Bar Shooting"). Exhibit C at 34:9-11 (JA 0175); *see also* Exhibit E (JA 0288-0300); *see also* Exhibit F (JA 0301-0311).

14. Inv. Heffner attempted to speak with Samuel Randolph on September 5, 2001 about the Roebuck's Bar Shooting, but Randolph requested an attorney and the investigation was terminated. Exhibit F at 1 (JA 0302).

15. Randolph was listed as both a suspect and a victim in the Roebuck's Bar Shooting. Exhibit E at 1 (JA 0289).

16. Inv. Heffner also spoke to Donald Roebuck on September 5, 2001, who confirmed the information that he gave to Ofc. Abromitis. Exhibit F at 1 (JA 0302).

17. However, as no victims had come forward to identify the shooters, Det. Heffner administratively closed the case. Exhibit F at 1 (JA 0302).

18. On February 7, 2002, Inv. Lau and Inv. Heffner interviewed Gary Waters, who suspected Randolph was responsible for the Roebuck's Bar Shooting based on the fight that occurred on the previous Friday night, August 31, 2001,

inside Roebuck's Bar ("the Bar Fight"). *See*, Probable Cause Affidavit for the Roebuck's Bar Shooting, attached hereto as Exhibit "G" at 1 (JA 0313); *see also* Exhibit F at 1 (JA 0302).

19.    Thomas Easter and Alister Campbell were with Gary Waters the night of August 31, 2001 during the Bar Fight. Exhibit F at 1 (JA 0302).

20.    Waters was also injured in a subsequent shooting incident in the late night / early morning hours of September 2, 2001 / September 3, 2001, which was assigned Incident No. 2001-09-000719 (the "Maclay Street Shooting"). *See* the Affidavit of Probable Cause for the Maclay Street Shooting, attached hereto as Exhibit "H" at 4 (JA 0323).

21.    The night after the Bar Fight, Waters, Campbell, and Collins attempted to gain access to Roebuck's Bar but were not permitted and instead stood on the street, when, in the early morning hours of September 2, 2001, a vehicle pulled up and began shooting at them. Exhibit F at 2 (JA 0303); Exhibit G at 4 (JA 0326).

22.    During the interview with Inv. Heffner, Waters stated that he believed the front seat passenger of the dark car which pulled up and begin shooting at him and Campbell was Samuel Randolph, although he could not be sure. Exhibit F at 1 (JA 0302).

23.     On February 10, 2002, Donald Roebuck told Inv. Heffner that the Bar Fight involved Randolph, Waters, Campbell and Collins. Exhibit F at 3 (JA 0304).

24.     On February 13, 2002, Ronald Roebuck told Inv. Lau and Inv. Heffner that he witnessed Bar Fight and saw Waters and Thomas Easter joined in to beat up Randolph. Exhibit F at 3 (JA 0304).

25.     Also on February 13, 2002, Ronald Roebuck further stated that he saw Randolph firing a handgun during the September 2, 2001 drive-by shooting. Exhibit G at 1 (JA 0317).

26.     After she reached out to Harrisburg Bureau of Police, Inv. Heffner interviewed Syretta Clayton on February 14, 2002, who stated that she had relevant information. Exhibit F at 4 (JA 0305).

27.     Clayton informed Inv. Heffner that Randolph was the individual who shot Waters during the Roebuck's Bar Shooting, and Jerome Britton was the back seat passenger. Exhibit F at 4 (JA 0305).

28.     Syretta Clayton identified Randolph as the individual involved in the Roebuck's Bar Shooting via photo array arranged by Det. Timothy Carter. Exhibit F at 4 (JA 0305).

29.     Inv. Heffner prepared a Criminal Complaint and Affidavit of Probable Cause in relation to the Roebuck's Bar Shooting. Exhibit G (JA 0312-0318).

**<u>Drive-by Shooting at Maclay Street and Investigation</u>**

30.     In the late night hours of September 2, 2001, a drive-by shooting occurred in the vicinity of 6th Avenue and Maclay Street in Harrisburg, PA ("Maclay Street Shooting"), which was assigned Incident No. 2001-09-00719. *See* ECF 1, ℙ 17, ECF 21, ℙ 17; *see also* Voluntary Statements by witnesses, attached hereto as Exhibit "I" (JA 0325-0333); *see also* Exhibit H at 1 (JA 0323).

31.     Det. Lau was the principal investigator for the Maclay Street Shooting. Exhibit C at 33:6-8 (JA 0174); *see also* Exhibit B at 16:22-17:3 (JA 0071-0072).

32.     Following his statement to Inv. Heffner on February 7, 2001, Inv. Lau continued the investigation under the Maclay Street Shooting, at which time Waters was able to identify Randolph as the shooter in this incident from a photo array provided by Det. Lau. Exhibit F at 1-2 (JA 0302-0303); Exhibit B at 40:5-41:24 (JA 0095-0096); Exhibit H at 5 (JA 0324).

33.     On February 15, 2002 Det. Lau prepared a Criminal Complaint and Probable Cause Affidavit against Plaintiff in relation to the Maclay Street Shooting. Exhibit H (JA 0319-0324).

### Continued Investigation into the Roebuck's Bar Shooting

34.     Inv. Heffner made several different photo arrays which included Plaintiff, Gary Waters, Alister Campbell, and Ronald Collins. Exhibit F at 2 (JA 0303).

35.    Donald Roebuck told police that he observed Campbell return fire towards the vehicle but could not see who was shooting from inside the vehicle. Exhibit F at 2 (JA 0303).

36.    Donald Roebuck spoke with Heath Wells, a bar patron, who said he (Wells) and others were afraid of Plaintiff because of the number of people he is suspected of killing. Exhibit F at 2 (JA 0303).

37.    Inv. Heffner contacted Heath Wells, who was uncooperative and told police only that he heard the shots. Exhibit F at 2 (JA 0303).

38.    On February 11, 2002, Inv. Heffner spoke with Shawn Sellers, a bar bouncer who witnessed the shooting, who identified Alister Campbell as one of the suspects but could not identify the second person in the car. Exhibit F at 3 (JA 0304).

39.    On February 13, 2002, Inv. Heffner, Det. Lau, and later Det. Carter spoke with Ronald Roebuck, who told officers that he witnessed the Friday night fight between Campbell and Randolph, in which Waters and Easter joined in to beat up Plaintiff. Exhibit F at 3 (JA 0304).

40.    Ronald Roebuck also told police that on Saturday night, the individuals unsuccessfully tried to enter the bar, at which time a dark-colored car containing Plaintiff drove up and Ronald recalled Plaintiff saying something to the effect of "I'll be back." Exhibit F at 3 (JA 0304).

41.     Ronald Roebuck then told police that Plaintiff returned approximately ten (10) minutes later, passing the area where the individuals were standing outside the bar, and began shooting at them. Exhibit F at 3 (JA 0304).

42.     Campbell and Collins returned fired and began shooting at the Plaintiff's car and chased the car on foot down 6th Street. Exhibit F at 3 (JA 0304).

43.     Ronald Roebuck identified Plaintiff in the photo array as the individual he saw begin shooting and Collins and Campbell as the individuals who returned fire. Exhibit F at 3 (JA 0304).

44.     Ronald Roebuck reported to police that he spoke with Plaintiff later and told him that Wells wanted him to pay for the damages to his vehicle, to which Plaintiff responded something to the effect of, "I'll take care of it." Exhibit F at 3 (JA 0304).

45.     On February 17, 2002, Inv. Heffner briefed Assistant District Attorney Fran Chardo over the phone, who told Inv. Heffner to charge Campbell and Collins with aggravated assault and related firearm charges based upon their return fire. Exhibit F at 4 (JA 0305).

46.     On March 10, 2002, Inv. Heffner interviewed Andre Butts, who witnessed the fight at Roebuck's Bar between Waters, Campbell, Easter, and Plaintiff and noted Jerome Britton's presence as well. Exhibit F at 4 (JA 0305).

47.     Butts told investigators that he attempted to break up the fight by holding Plaintiff back and Plaintiff hit Butts in the face with his fist, for which Plaintiff later apologized. Exhibit F at 4-5 (JA 0305-0306).

48.     On March 19, 2002, Inv. Heffner and Det. Lau interviewed Jerome Britton, who stated that Plaintiff became involved in a fight inside the bar with Waters, Campbell, Easter, Keemya Washington, and one other person, which was broken up by Jerome Britton. Exhibit F at 5 (JA 0306).

49.     After viewing photo arrays with Waters, Campbell, Collins, and Plaintiff, Britton identified Waters, Campbell, Washington, and Plaintiff as individuals involved in the fight. Exhibit F at 5 (JA 0306).

50.     On March 26, 2002, Inv. Heffner spoke with Alister Campbell, who denied firing a gun during the Roebuck's Bar Shooting, before asking for his attorney and ending the interview. Exhibit F at 6 (JA 0307).

51.     The Criminal Complaint and Affidavit of Probable Cause for Plaintiff's arrest was reviewed and approved by Magisterial District Judge Rebecca Margerum on February 18, 2002. Exhibit G at 2 (JA 0318).

52.     On February 18, 2002 Dauphin County issued an Arrest Warrant for Plaintiff for aggravated assault. *See*, Warrant, attached hereto as Exhibit "J" (JA 0334-0335).

**September 19, 2001 Double Murder at Todd and Pat's and Investigation**

53. On the night of September 19, 2001, a masked individual committed a double murder, shooting and killing Thomas Easter and Anthony Burton at a bar called Todd and Pat's Bar ("Todd and Pat's Shooting"). *See* ECF 1 ¶¶ 17, 23; ECF 21, ¶ 17, 23.

54. Det. Timothy Carter was the principal lead investigator for this incident. Exhibit C at 35 (JA 0176); Exhibit B at 17-18 (JA 0072-0073).

55. Sgt. Fegan had no direct involvement in the investigation. Exhibit A at 28-29 (JA 0029-0030).

56. On September 22, 2001, Det. Timothy Carter applied for a search warrant for the residence of Quendell Olivier for handguns, related items, and several articles of clothing. *See*, Search Warrant and Affidavit of Probable Cause, attached hereto as Exhibit "K" (JA 0336-0339).

57. On December 12, 2001, Det. Carter applied for a search warrant for Plaintiff's blood, hair, and saliva. *See*, Search Warrant and Affidavit of Probable Cause, attached hereto as Exhibit "L" (JA 0340-0344).

58. The Affidavit of Probable Cause states the itemed seized were evidence connected to the Todd and Pat's Shooting on September 19, 2001. Exhibit L (JA 0340-0344).

59.    The Affidavit of Probable Cause also states that Plaintiff evaded police and disobeyed commands, instead yelling, "shoot me." Exhibit L (JA 0340-0344).

60.    Sgt. Fegan was not involved in the investigation into the murders. Exhibit A at 14:4-11 (JA 0015).

61.    Det. Lau testified that his role in the Todd and Pat's Shooting was limited to merely assisting Inv. Timothy Carter in the investigation into the murders "as needed." Exhibit B at 17:19-24 (JA 0072).

62.    Inv. Heffner testified that Inv. Carter would have had access to his reports, but it was not his role to join the homicide investigation unless he had specific information for it, which he did not. Exhibit C at 34:2-5; 61:24-63:1 (JA 0175; 0202-0204).

63.    Inv. Duffin testified that his role in the Todd and Pat's Shooting was "very limited" and testified that he only assisted Inv. Timothy Carter in the investigation into the murders "off and on." Exhibit D at 12:21-14:1; 38:3-40:3 (JA 0253-0255; 0279-0281).

64.    Act. Captain Rapak authored a Criminal Complaint and Affidavit of Probable Cause and on April 25, 2022 Dauphin County issued an Arrest Warrant, for Plaintiff on two counts of murder and related charges. *See*, Affidavit of Probable Cause and Warrant, attached hereto as Exhibit "M" (JA 0345-0351).

**Arrest and Grand Jury Indictment**

65.     The Dauphin County Court of Common Pleas also issued a capias warrant for Plaintiff's arrest. *See*, ECF 1 ⸿ 66; ECF 21, ⸿ 66; *see also* excerpts from Supplemental Report, attached hereto as Exhibit "N" at 1 (JA 0353).

66.     Plaintiff was arrested by Inv. Heffner and Det. Timothy Carter in Virginia on November 29, 2001. *See*, ECF 1 ⸿⸿ 67-68; ECF 21, ⸿ 67-68; *see also* Exhibit N at 3-4 (JA 0355-0356).

67.     On April 17, 2002, the First Dauphin County Investigating Grand Jury issued a Presentment finding probable cause to believe that Plaintiff (1) shot at a group of men on the street outside Roebuck's Bar on September 2, 2001, (2) shot and injured Gary Waters on Maclay Street on September 2, 2001, and (3) Plaintiff entered Todd and Pat's Bar on September 19, 2001 wearing a mask, and opened fire, killing Anthony Burton and Thomas Easter. *See*, Grand Jury Presentment, attached hereto as Exhibit "O" at 1-2 (JA 358-0359).

**No Evidence of Coercion or Fabrication in Investigation**

68.      Amahl Scott testified at Plaintiff's criminal trial, identifying Plaintiff as the shooter in the September 19, 2001 shooting which killed Thomas Easter and Anthony Burton. *See*, Plaintiff's Volume II deposition transcript, attached hereto as Exhibit "P" at 161:5-24. (JA 0368).

13

69.     Plaintiff admits that he has no evidence to substantiate his claim that Scott was arrested for the purpose leveraging the arrest to identify Plaintiff as the shooter in the Todd and Pat's Bar shooting. Exhibit P at 161-164 (JA 0368-0371).

70.     Plaintiff admits that he has no evidence to support his allegation that Alister Campbell was arrested for the purpose of compelling him to identify Plaintiff as the shooter in any of the September 2001 incidents. Exhibit P at 170-172 (JA 0372-0374).

71.     He further admits that he has no evidence that any of the Officer Defendants were involved in procuring a deal for Campbell to identify Plaintiff as the shooter. Exhibit P at 171-172 (JA 0373-0374).

72.     Plaintiff admits that he has no evidence to support his claim that Gary Waters was coerced by any of the Officer Defendants to identify Plaintiff as the shooter in the Roebuck's Bar Shooting or Maclay Street Shooting. *See*, Transcript of Plaintiff's Deposition, dated December 4, 2024, attached hereto as Exhibit "Q" at 131:18-132:22 (JA 0387-0388).

73.     Instead, Plaintiff relies solely on an allegation that Waters "gave several conflicting statements" and only identified Randolph in the shooting after he was arrested. Exhibit Q at 131:18-133:22 (JA 0387-0389).

74.     However, Waters never gave a statement to police before he was arrested on drug related charges. Exhibit B at 38-39 (JA 0093-0094).

14

75.    Det. Lau testified that he was unable to contact Waters about the Maclay Street shooting prior to his arrest on drug charges. Exhibit B at 39:21-25 (JA 0094).

76.    Plaintiff admits that he is unaware of any evidence to support his claim that Inv. Heffner and Inv. Lau told Donald Roebuck and Heath Wells to identify Randolph as the shooter in the Roebuck's Bar shooting. Exhibit P at 193:6-194:14 (JA 0375-0376).

77.    Plaintiff admits that he has no evidence to support this contention that Ronald Roebuck did favors for police. Exhibit P at 195:19-196:19 (JA 0377-0378).

78.    Det. Lau has never offered leniency or any other inducement to a witness in exchange for testimony. Exhibit B at 53:13-19 (JA 0108).

79.    Det. Heffner testified that he never threatened, pressured, or coerced any witnesses in the September 2001 shootings to give any form or testimony or statement. Exhibit C at 77:23-78:2 (JA 0218-0219).

80.    He never offered to pay for the statements of any witnesses or offered leniency on charges in return for their statement. Exhibit C at 78:3-6 (JA 0219).

81.    During Inv. Heffner's initial interview with Alister Campbell, Campbell refused to cooperate unless Heffner promised leniency in the charges against him related to the Roebucks Bar Shooting and some drug charges. Exhibit C at 23:8-24:24 (JA 0164-0165).

82.    Heffner declined and ended the interview. Exhibit C at 23:15-19 (JA 0164).

83.    Sgt. Fegan testified that any offers of leniency in order for a witness to testify in any criminal matter would have to come from the District Attorney and "officers can't make promises like that." Exhibit A at 20:14-21:11 (JA 0021-0022).

**Police Investigated the Alleged Alternate Suspect Alexander Bush**

84.    On August 1, 2003, Inv. Heffner met with Det. Lau and ADA Chardo, the latter of whom informed Inv. Heffner that he learned about new information indicating a man named Andrew Stanko told police in Johnstown, PA that Alexander Bush claimed he shot multiple people in Harrisburg. *See*, Supplemental Report, attached hereto as Exhibit "R" at 1 (JA 0391).

85.    Alex Bush was found to be in possession of a newspaper clipping of the shooting. Exhibit R at 1 (JA 0391).

86.    Inv. Heffner, with Dets. Vogle and Lau, and then-Chief Deputy District Attorney Chardo, interviewed Bush about this claim on August 1, 2003. Exhibit R at 1 (JA 0391).

87.    Bush denied claiming to have committed the murders and explained that his sibling sent the newspaper clipping to his aunt's home. Exhibit R at 1 (JA 0391).

16

88. Bush explained his presence traveling between Harrisburg and Johnstown between July and September 2001. Exhibit R at 1 (JA 0391).

89. Inv. Heffner followed up and confirmed that Bush was not present in Harrisburg area during the immediate timeframe of the homicides. Exhibit R at 1 (JA 0391).

90. During his interview, Bush did not deny dealing drugs. Exhibit R at 1 (JA 0391).

91. He denied any involvement in the shootings for which Plaintiff agreed to a polygraph if necessary. Exhibit R at 1 (JA 0391).

## Conviction, Incarceration, and Appeals

92. On May 14, 2003, Plaintiff was convicted in the Dauphin County Court of Common Pleas of two counts of first-degree murder, conspiracy to commit murder, two counts of criminal attempt, three counts of aggravated assault, two counts of firearm violation, and reckless endangerment. *See,* Opinion affirming sentence, attached hereto as Exhibit "S" at 1 (JA 0394).

93. Det. Lau did not testify at Plaintiff's criminal trial. Exhibit B at 37:23-25 (JA 0092).

94. Inv. Duffin did not testify at Plaintiff's criminal trial. Exhibit D at 36:22-24 (JA 0277).

17

95.     Sgt. Fegan did not testify at Plaintiff's criminal trial. Exhibit A at 49:5-7 (JA 0050).

96.     Inv. Heffner briefly testified at Plaintiff's criminal trial to only verify a statement made by Syreeta Clayton. Exhibit C at 73:7-13 (JA 0214).

97.     Plaintiff was incarcerated and sentenced to death. *See* ECF 1 ¶ 15; ECF 21 ¶ 15, *see also* Exhibit S at 1, 7 (JA 0394; 400).

98.     After a series of appeals, Plaintiff was granted a new trial on the basis of Sixth Amendment issues involving Plaintiff's right to be represented by counsel of his choice. *See* ECF 1 ¶ 170, fn. 7.

99.     The Dauphin County District Attorney's Office appealed the decision granting a new trial, which was affirmed by the Third Circuit, before petitioning the United States Supreme Court, which denied certiorari. *See* ECF 1 ¶¶ 171-175; ECF 21 ¶ 171-175.

100.    Plaintiff's matter was remanded to the Dauphin County Court of Common Pleas, which moved for *nolle prosequi* in April 2022, dismissing all charges against Plaintiff. *See* ECF 1 ¶¶ 176-177; ECF 21 ¶ 176-177.

## Training, Policy, and Practice

101.    The Harrisburg Police Department ("HPD") had a hiring process whereby successful applicants were hired conditionally as cadets and sent to basic training to become a police officer under the standards of the Municipal Police

Officers Education and Training Commission ("MPOETC"). *See*, Declaration of Dennis Sorenson on behalf of the City of Harrisburg, attached hereto as Exhibit "T" at ℙ 7 (JA 0403).

102. Cadets went through basic training conducted by the MPOETC. Exhibit T ¶ 8 (JA 0403).

103. David Lau completed basic training and was certified under Act 120 by the MPOETC in 1991. Exhibit T ℙ 9 (JA 0404); Exhibit B at 70:12-19 (JA 0125).

104. Donald Heffner completed his Act 120 training in 1992. Exhibit T ¶ 9 (JA 0404); Exhibit C at 94:16-19 (JA 0235).

105. The Act 120 basic training curriculum was approximately 480 hours of training that covered the core topics for police work, such as 100 hours of training under "Law," which included authority, jurisdiction, criminal law, criminal procedure & evidence, and law topics, and a block of 41 hours training for "Investigations." Exhibit T ¶ 10 (JA 0404).

106. After obtaining Act 120 certification through MPOETC, an officer would begin their in-house and field training with the HPD. Exhibit T ¶ 12 (JA 0404); Exhibit B at 70:23-71:8 (JA 0125-0126); Exhibit C at 94:24-95:7 (JA 0235-0236).

19

107.   In the field training program, officers received training and feedback on the various aspects of being a patrol officer, which included conducting interviews and preparing police reports, probable cause affidavits, and criminal complaints. Exhibit B at 71:12-72:21 (JA 0126-0127); Exhibit T at ¶¶ 13-14 (JA 0404-0405); Exhibit C at 9:18-23 (JA 0150).

108.   Police officers are required to attend mandatory training courses with the MPOETC each year, which included legal updates, case law review, and any other courses determined by the MPOETC. Exhibit T ⁋ 16 (JA 0405); Exhibit C at 96:1-6 (JA 0237).

109.   Officers who were chosen for assignment to the Criminal Investigations Division ("CID") received additional career development, which included a 90-day program that was more advanced training on investigations. Exhibit T ¶ 15 (JA 0405); Exhibit B at 73:9-22 (0128); Exhibit C at 96:11-97:12 (0237-0238).

110.   The HPD Commissioner had overall responsibility for policy and training, but it involved delegation to the captains and included lieutenants and other supervisors depending on their expertise. Exhibit T ¶ 20 (JA 0405).

111.   The HPD maintained a Training Unit Standard Operating Procedure and would regularly evaluate the type of additional training that would benefit the department. Exhibit T ¶ 6 (JA 403).

112.    The HPD reviewed a monthly bulletin on legal updates and would distribute information from these updates where appropriate. Exhibit T ¶ 17 (JA 405).

113.    The HPD was accredited with the Commission on Accreditation for Law Enforcement Agencies ("CALEA"). Exhibit T ¶ 18 (JA 405).

114.    In 2003, Harrisburg switched accreditation agencies from CALEA to the Pennsylvania Chiefs of Police Association. Exhibit T ¶ 19 (JA 405).

115.    The HPD has maintained its accreditation status, which required changes when there were any issues identified by the agency. Exhibit T ¶ 30 (JA 407).

116.    Compliance with accreditation standards required written policies that aligned with the guidelines and proof that the standards were being followed. Exhibit T ¶¶ 22-24 (JA 406).

117.    The audit process conducted by the accrediting agency involved the review of orders, policies and memoranda, interviews, ride-alongs, and physical inspections. Exhibit T ¶¶ 28-29 (JA 407).

118.    The accreditation manager held meetings to review the current standards, especially when updates were required to comply with the best practices of law enforcement. Exhibit T ¶ 25 (JA 406).

21

119. The process of developing general orders involved use of the accreditation agency's policies and the identification of issues that needed to be addressed for compliance, as well as issues raised by personnel. Exhibit T ¶ 27 (JA 406).

120. The accreditation manager assisted the HPD in the development of general orders and policies to ensure compliance with the accreditation standards. Exhibit T ¶¶ 21, 26 (JA 406).

121. It was standard practice in homicide investigations for the primary investigator(s) to work closely with the Dauphin County District Attorney's office. Exhibit T ¶ 31 (JA 407); Exhibit B at 74:11-15 (JA 0129).

122. The lead detective(s) in a homicide investigation would submit the case information and draft affidavits for review and authorization to proceed with a search warrant or the filing of charges. Exhibit B at 74:16-76:8 (JA 0129-0131); Exhibit T ¶ 32 (JA 0407).

**Other Cases Involving Alleged Investigatory Misconduct**

123. The HPD has no record of any instance where the former HPD personnel who are named in paragraphs 7 through 11 of the Complaint filed by Mr. Randolph — Robert Fegan, David Lau, Donald Heffner, Timothy Carter, and Kevin Duffin — were found or determined by any Judge, Jury, external agency (such as the FBI), or internal agency (such as Internal Affairs) to have engaged in

22

unconstitutional investigation tactics. Exhibit T ¶¶ 33, 34 (JA 0407-0408); *see also* Memorandum from Internal Affairs to Chief Judge Christopher Conner, attached hereto as Exhibit "U" (JA 0409-0410).

124.  During discovery, the City of Harrisburg identified complaints made against the Individual Defendants from September 1996 through September 2006. *See*, City of Harrisburg's Responses to Request for Production of Documents No. 7, attached hereto as Exhibit "V" at 5-7 (JA 0413-0415).

125.  Plaintiff identifies in his Complaint four other criminal defendants who allegedly have been wrongfully prosecuted and/or convicted by City of Harrisburg police officers: Lorenzo Johnson, Sean Primm, Larry Trent Roberts, and Dennis Robinson. ECF 1 ¶¶ 188-254.

### Lorenzo Johnson

126.  Lorenzo Johnson was charged with criminal homicide and criminal conspiracy in connection with the December 15, 1995, shooting of Taraja Williams. *See Com. v. Johnson (Memorandum Opinion and Order)*, No. 1544 CD 1996 (Dauphin Co. Feb. 14, 2002); *Com. v. Johnson (Memorandum Op.),* No. 406 MDA 2002 (Pa. Super. July 17, 2003).

127.  On March 27, 1997, Johnson and a co-defendant "were found guilty of murder in the first degree and criminal conspiracy to commit murder." *Johnson v. Mechling*, 541 F. Supp. 2d 651, 653 (M.D. Pa. 2008).

128.    Johnson was not successful with his direct appeal or PCRA petitions he filed in Pennsylvania courts. *Mechling*, 541 F. Supp. 2d at 653-654, 671.

129.    Johnson filed a petition for writ of habeas corpus with this Court wherein he challenged the sufficiency of the evidence and claimed a *Brady* violation. *Id*. at 658, 676.

130.    The District Court reviewed the trial testimony of fourteen witnesses, one of whom was Inv. Duffin. *Id*. at 667-670.

131.    The District Court analyzed and rejected Johnson's sufficiency of the evidence claim. *Id*. at 670-675.

132.    Johnson's *Brady* claim was "that his due process rights were violated by the failure of the prosecution to disclose the existence of a plea agreement between the government and witness Victoria Doubs." *Id*. at 676.

133.    The District Court analyzed and rejected Johnson's *Brady* claim. *Id*. at 677-687.

134.    The Third Circuit Court of Appeals reversed on the sufficiency issue, finding that "the Pennsylvania Superior Court's decision affirming Johnson's conviction was an unreasonable application of the Constitutional requirement that the Commonwealth present evidence sufficient to prove every element of a crime beyond a reasonable doubt." *Johnson v. Mechling*, 446 F. App'x 531, 541-544 (3d Cir. 2011).

135.   The United States Supreme Court reversed, holding that the Third Circuit erred and that the evidence was sufficient to uphold the Jury's verdict. *Coleman v. Johnson*, 566 U.S. 650 (2012).

136.   The docket reflects that, on July 11, 2017, the Dauphin County Court of Common Pleas accepted Johnson's plea of *nolo contendere* for third degree murder and conspiracy to commit murder of the third degree with sentences of 10-20 years and 5 years, respectively. *See*, Johnson's Criminal Docket, attached hereto as Exhibit "W" (JA 0417-0433).

137.   Plaintiff testified that he has no evidence to support the allegations in his Complaint against Inv. Duffin regarding Johnson's conviction. Exhibit P at 220:13-20 (JA 0379).

138.   Plaintiff testified that he has no personal knowledge regarding the facts of the Lorenzo Johnson conviction in March 1997. Exhibit P at 241:17-22 (JA 0380).

139.   In response to Defendants' discovery requests, Plaintiff identified documents that have been Bates-numbered as SR-0054688-SR0054806 and SR0055693-SR0055696 as supporting the allegations in Paragraphs 188 through 197 (related to Lorenzo Johnson) of the Complaint. *See*, Plaintiff's Response to City of Harrisburg's Request No. 11, attached hereto as Exhibit "X" at 2 (JA 0436).

25

140.   SR-0054688-54806 and SR0055693-55696 generally are documents related to some of Plaintiff's grievances and are part of a file that Plaintiff produced and labeled "PO DOC Records," which contains a representative sampling of these documents. Exhibit X at 7-33 (JA 0441-0467).

141.   Plaintiff testified that he had conversations with Johnson but did not discuss the specifics of Johnson's case or conviction; they "both were having issues of innocence, so we constantly talked about that, some of the legal stuff going on with the cases." *See*, Plaintiff's deposition transcript from 12/18/2024, attached hereto as Exhibit "Y" at 35:5-42:10 (JA 0473-0480).

### Sean Primm

142.   Plaintiff's Rule 26 disclosures included two documents relating to the prosecution of Sean Primm: a newspaper article reporting on the jury verdict (SR0014536) and a transcript of the criminal trial (SR0014537-15150). *See*, Plaintiff's Initial Disclosure Statement, attached hereto as Exhibit "Z" (JA 0487-0494).

143.   Sean Primm was charged and prosecuted in connection with the September 22, 2005, shooting death of Alvin Ortega. *See*, Notes of Testimony from Sean Primm Criminal Proceedings, attached hereto as Exhibit "AA" (JA 0495-0505); *see also*, Exhibit 35 to Inv. Heffner's Deposition, attached hereto as Exhibit "BB" (JA 0506-0507).

144. Donald Heffner was the lead detective and testified at the criminal trial. Exhibit C at 71:16-72:24 (JA 0212-0213); Exhibit AA (JA 0495-505).

145. On May 24, 2007, the jury found Sean Primm not guilty of (1) criminal homicide and (2) carrying a firearm without a license. Exhibit AA (JA 0495-505).

146. A docket search for "Sean Primm" on the Unified Judicial System of Pennsylvania Web Portal for Dauphin County yields eight matters filed in the Court of Common Pleas Criminal Docket which are accessible and does not include the docket number identified in Plaintiff's Complaint (2915 CR 2006). *See*, Docket Search, attached hereto as Exhibit "CC" (JA 0508-0512).

147. A docket search for "Sean Primm" in the United States District Court for the Middle District of Pennsylvania results in no information found. Exhibit CC (JA 0508-0512).

148. A docket search for "Sean Primm" in the Court of Common Pleas of Dauphin County Civil Division results in two cases, neither of which relate to the prosecution of Sean Primm as alleged in Plaintiff's Complaint. Exhibit CC (JA 0508-0512).

149. In response to Defendants' discovery requests, Plaintiff identified documents Bates-numbered as SR-0054807-SR0055414 and SR0055693-

27

SR0055696 as supporting the allegations in Paragraphs 198 through 221 (related to Sean Primm) of the Complaint. Exhibit X at 3 (JA 0437).

150.   SR-0054807-55414 and SR0055693-55696 generally are documents related to some of Plaintiff's grievances and are part of a file that Plaintiff produced and labeled "PO DOC Records," which contains a representative sampling of these documents. Exhibit X at 7-33 (JA 0441-0467).

151.   Plaintiff testified that he never communicated with Sean Primm and did not know or communicate with any of the individuals identified in the Complaint related to Primm's case. Exhibit Y at 42:11-43:15 (JA 0480-0481).

152.   Plaintiff has no personal knowledge regarding the 2007 murder trial of Sean Primm. Exhibit P at 241:23-242-8 (JA 0380-0381).

153.   Plaintiff has not spoken to Sean Primm's attorneys or investigators. Exhibit Y at 92:11-20 (JA 0486).

### Larry Trent Roberts

154.   Larry Trent Roberts was charged and prosecuted for the December 2005 murder of Duwan Stern. *Commonwealth v. Roberts*, No. 1148 MDA 2017, 2018 WL 4922783, at *1-2 (Pa. Super. Oct. 10, 2018).

155.   On November 14, 2007, a Dauphin County jury found Roberts guilty of first-degree murder. *Commonwealth v. Roberts*, No. 1148 MDA 2017, 2018 WL 4922783, at *2 (Pa. Super. Oct. 10, 2018).

156. Roberts' trial counsel was determined to have been "ineffective in failing to call Tyisha Williams as a witness, and present her receipt from Target, in support of Roberts' alibi defense and that Roberts was entitled to relief in the form of a new trial." *Commonwealth v. Roberts*, No. 1148 MDA 2017, 2018 WL 4922783, at *9 (Pa. Super. Oct. 10, 2018).

157. The Court of Common Pleas of Dauphin County granted a new trial to Roberts on June 17, 2017, which was affirmed by the Superior Court on October 10, 2018. *Commonwealth v. Roberts*, No. 1148 MDA 2017, 2018 WL 4922783 (Pa. Super. Oct. 10, 2018).

158. Roberts was acquitted on retrial in 2019. *Roberts v. Lau*, No. 1:21-CV-1140, 2024 WL 1386032, at *1 (M.D. Pa. Apr. 1, 2024).

159. Roberts filed a lawsuit styled *Larry Trent Roberts v. David Lau, et al.*, Civil No. 1:21-CV-1140, which is pending before This Honorable Court.

160. Plaintiff has communicated with Larry Trent Roberts but has no knowledge of the facts of Roberts's case. Exhibit Y at 43:16-44:17 (JA 0481-0482); Exhibit P at 242:9-12 (JA 0381).

161. Plaintiff testified that he does not know nor did he communicate with any of the individuals identified in his Complaint relating to the Roberts's case or any of Roberts's attorneys or investigators. Exhibit Y at 44:18-45:15, 46:14-21 (JA 0482-0484).

**Dennis Robinson**

162.   Dennis Robinson was prosecuted for the October 2009 homicide of Jermaine Dawson. *Commonwealth v. Robinson*, 2020 WL 1491362, at *1-2, No. 711 MDA 2019 (Pa. Super. 2020).

163.   Robinson was "found guilty of criminal homicide and firearms not to be carried without a license following a four-day jury trial" in October 2011. *Commonwealth v. Robinson*, 2020 WL 1491362, at *1.

164.   Dennis Robinson filed two Post Conviction Relief Act petitions related to his 2011 conviction of criminal homicide and firearms not to be carried without a license. *Commonwealth v. Robinson*, 2020 WL 1491362, No. 711 MDA 2019 (Pa. Super. 2020), *appeal denied*, 244 A.3d 7 (Table) (Pa. 2021) ("Robinson First PCRA"); *Commonwealth v. Robinson*, 320 A.3d 732 (Pa. Super. 2024), *on remand, aff'd,* 336 A.3d 1006 (Pa. Super. 2025), appeal denied, 347 A.3d 660 (Table) (Pa. 2025) ("Robinson Second PCRA").

165.   Robinson's First PCRA petition alleged a *Brady* violation and three allegations of ineffective assistance of counsel. *Robinson*, 2020 WL 1491362, at *1.

166.   The basis of Robinson's "*Brady* claim is that the Commonwealth failed to disclose that prior to [the] trial, the Commonwealth entered into an agreement with Greene, the chief prosecution witness, that Greene would receive

30

leniency regarding his outstanding felony charges in exchange for testimony against [Robinson]." *Robinson*, 2020 WL 1491362, at *3.

167.  The Superior Court found that "a *Brady* violation has not been established," explaining "there is no evidence that a deal had been made" and that the testimony of both the chief prosecution witness and the prosecutor "directly contradict this assertion." *Robinson*, 2020 WL 1491362, at *5.

168.  On Robinson's Second PCRA petition, the Superior Court again affirmed the trial court, finding that Greene's counsel explained, "in no uncertain terms, that Greene was expressly not receiving a benefit for his testimony and that Greene knew he was receiving no benefit." *Robinson*, 336 A.3d at *4.

169.  Plaintiff testified that he has no personal knowledge regarding the facts of the Dennis Robinson case and had never communicated with Robinson or anyone working on his behalf. Exhibit P at 242:13-19 (JA 0381); Exhibit Y at 45:16-46:13, 46:22-25, 47:1-8 (JA 0483-0485).

170.  In response to Defendants' discovery requests, Plaintiff identified documents that have been Bates-numbered as SR-0055513-SR0055592 and SR0055693-SR0055696 as supporting the allegations in Paragraphs 241 through 254 (related to Dennis Robinson) of the Complaint. Exhibit X at 25-26 (JA 0473-0438).

171.   SR-0055513-55592 and SR0055693-55696 generally are documents related to some of Plaintiff's grievances and are part of a file that Plaintiff produced and labeled "PO DOC Records." Exhibit X at 7-33 (JA 0441-0467), which contains a representative sampling of these documents.

**MacMAIN LEINHAUSER PC**

Dated: <u>May 14, 2026</u>        By:   */s/ Brian C. Conley*
                                       David J. MacMain
                                       Brian C. Conley
                                       Attorney I.D. Nos. 59320 / 311372
                                       433 W. Market Street, Suite 200
                                       West Chester, PA 19382
                                       dmacmain@macmainlaw.com
                                       bconley@macmainlaw.com
                                       484-318-7106
                                       *Attorneys for Defendants Sgt. Robert*
                                       *Fegan, Detective David Lau, and*
                                       *Investigators Donald Heffner and*
                                       *Kevin Duffin*

**CAMPBELL DURRANT, P.C.**

Dated: <u>May 14, 2026</u>        By:   */s/ Brian P. Gabriel*
                                       Brian P. Gabriel, Esquire
                                       Attorney I.D. No. 73132
                                       535 Smithfield Street, Suite 700
                                       Pittsburgh, PA 15222
                                       bgabriel@cdblaw.com
                                       412-395-1280
                                       *Attorney for Defendant City of*
                                       *Harrisburg*

## CERTIFICATE OF SERVICE

I, Brian C. Conley, hereby certify that on this 14th day of May 2026, the foregoing was served upon the following counsel of record via ECF:

Paul A. Ellis, Jr., Esquire
John K. Bryan, Esquire
Sommer Law Group, P.C.
6 Market Square
Pittsburgh, PA 15222
*Attorneys for Plaintiff*

Brian P. Gabriel, Esquire
Campbell Durrant, P.C.
535 Smithfield Street, Suite 700
Pittsburgh, PA 15222
*Attorney for Co-Defendant City of Harrisburg*

**MacMAIN LEINHAUSER PC**

By:   */s/ Brian C. Conley*
        Brian C. Conley
        Attorney I.D. No. 311372
        433 W. Market Street, Suite 200
        West Chester, PA 19382
        bconley@macmainlaw.com
        484-318-7106
        *Attorney for Defendants Sgt. Robert*
        *Fegan, Detective David Lau, and*
        *Investigators Donald Heffner and*
        *Kevin Duffin*

33